IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,579

In the Matter of JOAN M. HAWKINS,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed April 15, 2016. Eighteen-month suspension.

*Kimberly L. Knoll*, Deputy Disciplinary Administrator, argued the cause and was on the brief for the petitioner.

*Holly M. Perkins*, of Joseph, Hollander & Craft LLC, of Topeka, argued the cause, and *Stephen M. Joseph*, of the same firm, of Wichita, was with her on the brief for the respondent; *Joan M. Hawkins*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Joan M. Hawkins, of Lawrence, an attorney admitted to the practice of law in Kansas in 1999.

On June 11, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). After filing a motion for extension of deadlines and/or stay to obtain counsel and a motion to continue, which were granted, the respondent filed an answer on August 8, 2014. A prehearing conference was held on October 2, 2014, and a hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on October 9 and 10 and November 20, 2014, where the respondent was personally present

1

and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.16(d) (2015 Kan. Ct. R. Annot. 572) (termination of representation); 3.2 (2015 Kan. Ct. R. Annot. 595) (expediting litigation); 3.3(a)(1) (2015 Kan. Ct. R. Annot. 601) (candor toward tribunal); 3.4(d) (2015 Kan. Ct. R. Annot. 609) (failure to comply with discovery request); 8.1(b) (2015 Kan. Ct. R. Annot. 661) (knowingly failing to respond to a lawful demand for information from a disciplinary authority); 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"DA11619

"22.    In 2011, the respondent represented B.S. in a post-divorce matter before the District Court of Jefferson County, Kansas. On November 14, 2011, the respondent filed a motion to modify parenting time and child support. Julia Butler represented A.S., B.S.'s former wife.

"23.    On January 10, 2012, the court held a hearing on the motion. Following the hearing, the court ordered the parties to participate in mediation in an attempt to reach a parenting plan. On March 20, 2012, the parties filed an agreed journal entry for parenting plan and a joint parenting plan.

"24.    On March 26, 2012, Ms. Butler sent the respondent an electronic mail message and attached the agreed journal entry regarding the parenting plan. Ms. Butler reminded the respondent that they still needed to figure out child support and that if they could not agree, the matter should be set for hearing.

2

"25.     On March 30, 2012, Ms. Butler sent an electronic mail message to the respondent, attached a completed child support worksheet and alternatively provided two possible hearing dates in the event they were unable to come to an agreement about child support.

"26.     On April 5, 2012, Ms. Butler again wrote to the respondent. Ms. Butler indicated that she had not heard back from the respondent and asked whether the hearing dates would work.

"27.     On April 9, 2012, Ms. Butler wrote to the respondent again, asking whether the hearing dates worked for the respondent. On April 9, 2012, the respondent responded to Ms. Butler, indicating that her day had not gone according to plan but that she would contact Ms. Butler the following day.

"28.     On April 10, 2012, the respondent indicated that either of the two hearing times would work. Ms. Butler called the court, but, unfortunately, during the intervening 11 days, the court had scheduled other matters during the possible hearing times.

"29.     On April 16, 2012, Ms. Butler informed the respondent that those two dates were no longer available and queried whether May 9, 2012, at 3:30 p.m. would work for the respondent and her client. The respondent did not respond to Ms. Butler's April 16, 2012, email message.

"30.     On April 20, 2012, Ms. Butler again asked whether May 9, 2012, at 3:30 p.m. would work for the child support hearing.

"31.     On April 24, 2012, Ms. Butler again wrote to the respondent and informed the respondent that because the respondent had not replied to the April 16, 2012, and April 20, 2012, email messages, Ms. Butler had scheduled the hearing for May 9, 2012, at 3:30 p.m.

3

"32.    On April 27, 2012, the respondent wrote to Ms. Butler and indicated that her client was not available for a hearing on May 4th or May 5th. However, by this time, Ms. Butler had already told the respondent that the court no longer had those dates available and that the hearing was scheduled for May 9, 2012.

"33.    On May 1, 2012, the respondent wrote to Ms. Butler twice. In one email message, the respondent informed Ms. Butler that Ms. Butler's email message from April 16, 2012, had ended up in her junk mail. The respondent did not mention Ms. Butler's email messages from April 20, 2012, or April 24, 2012. In the other email message, the respondent made an offer to settle the child support matter.

"34.    Also on May 1, 2012, the respondent wrote to her client to see if he would be available for a hearing on May 9, 2012, at 3:30 p.m. The respondent's client informed the respondent that he was available for a hearing on May 9, 2012.

"35.    On May 7, 2012, the respondent's client wrote to the respondent and asked for confirmation that the hearing had been scheduled for May 9, 2012, at 3:30 p.m. before he asked for permission to take a day off from work. That same day, the respondent wrote to her client and indicated that she had not previously received a notice of the hearing. (However, Ms. Butler sent the notice of hearing *via* electronic mail message on April 24, 2012.) On May 7, 2012, the respondent also wrote to Ms. Butler and asked her about the status of scheduling A.S. and B.S.'s motion hearing.

"36.    On May 9, 2012, at 10:34 a.m., the respondent called the Jefferson County clerk's office and spoke with Michelle Olberding. The respondent told Ms. Olberding that neither she nor her client would be appearing at the hearing in the afternoon, as Ms. Butler had 30 days to provide certain financial information and that she had not received proper notice of the hearing. Further, the respondent informed Ms. Olberding that she would contact Ms. Butler about the respondent's request for a continuance. Ms. Olberding both immediately spoke with the chief clerk and made a note to the file, detailing the conversation.

4

"37.     Sometime that day, Ms. Butler ran into the respondent on the corner of 8th and Vermont in Lawrence and confirmed that they had a hearing scheduled for that afternoon at 3:30 p.m. Ms. Butler acknowledged that the respondent had an outstanding offer to settle the child support issue. Ms. Butler agreed to contact her client to determine whether her client was willing to accept the settlement offer. The respondent did not mention that she was interested in continuing the hearing.

"38.     On May 9, 2012, at 12:36 p.m., the respondent filed a 'motion for continuance and order for production' with the Jefferson County District Court by facsimile.

"39.     On May 9, 2012, at 12:57 p.m., Ms. Butler wrote to the respondent and informed her that her client was unwilling to settle the child support issue as the respondent proposed.

"40.     At 2:23 p.m., just over an hour before the hearing was scheduled to begin in Jefferson County District Court, the respondent sent Ms. Butler a copy of the 'motion for continuance and order for production' which she had filed by facsimile approximately two hours earlier. Ms. Butler did not see the motion in her electronic mail inbox until later.

"41.     At approximately 3:20 p.m., the clerk entered the courtroom where Ms. Butler and her client were waiting for the hearing to begin. Ms. Butler informed the clerk that they were not ready to proceed as the respondent and her client had not yet arrived. The clerk informed Ms. Butler that the respondent had called and informed the clerk's office that neither she nor her client would be coming to the hearing because she did not have proper notice of the hearing.

"42.     Judge Nafziger entered the courtroom and informed Ms. Butler that the respondent filed a motion to continue shortly before the scheduled hearing time. Ms. Butler informed the judge that she had not received a motion to continue the hearing, that she had seen the respondent earlier in the day, and that the respondent did not mention that she was not coming to the hearing that day. At that time, Ms. Butler checked her

5

electronic mail inbox on her mobile telephone and found that the respondent had forwarded a motion to continue by electronic mail message.

"43.    The court considered and denied the respondent's motion to continue, as it was filed late and was not agreed to.

"44.    After the court concluded the hearing, at 3:35 p.m., the respondent arrived at the Jefferson County Courthouse. Delpha M. Forshee, Deputy Clerk directed the respondent to Judge Nafziger's courtroom. However, the court had already completed the hearing.

"45.    The respondent did not attempt to reach Ms. Butler by telephone on May 9, 2012, until 3:41 p.m., after the respondent left the Jefferson County District Court.

"46.    On May 15, 2012, Ms. Butler forwarded a proposed journal entry to the respondent and to the court.

"47.    On May 23, 2012, the respondent filed a motion to set aside judgment. The respondent based her motion on an allegation that the hearing was scheduled for 3:00 p.m. when it was actually scheduled for 3:30 p.m. The hearing was not scheduled for 3:00 p.m. It was scheduled for 3:30 p.m. Additionally, on June 1, 2012, the respondent filed objections to Ms. Butler's proposed journal entry.

"48.    On June 21, 2012, the court held a hearing on the respondent's motion to set aside judgment and motion for rehearing. During the proceedings, the respondent denied stating to the clerk that neither she nor her client were going to be appearing at the May 9, 2012, hearing. Specifically, the respondent stated:

'JUDGE NAFZIGER:  I was advised that you had called the clerk's office and told them you were not going to appear and that you had told your client not to appear, and that you had not had sufficient notice for the hearing, or something. And so, therefore, the presumption was you weren't going to appear.

6

'MS. HAWKINS: Well, actually I did not know [*sic*] notify the Court of that and, in fact, I'd had a discussion with opposing counsel during the course of the day and shortly before the hearing.

. . . .

'MS. HAWKINS: but regardless, I did not, I did not notify the Court and say I would not be here. I did notify the Court and say are there some alternate dates that we could select from if we agree to continue this. And I communicated those dates to Ms. Butler. She said I am not going to agree to continue it. I at no time did I say that I was not going to appear on the matter. I merely said I was filing a motion to continue. That I was filing a motion to compel and that I did request some alternate dates but at no point did I tell anyone that I was not going to be here on that day.—

. . . .

'MS. HAWKINS: I, furthermore, do want to point out for the record that notice was insufficient. This Court is very clear on the fact that I do not accept email service in any of my cases and it's explicitly stated on all of my pleadings. The only communication I have ever received in this case from—

. . . .

'MS. BUTLER: Judge, um, I did, and I had tried to, um, get in contact with Ms. Hawkins numerous times to get a hearing date set and did not receive any response from her. So, finally I contacted the clerk's office, got the hearing date of May 9th at 3:30 and from the beginning of this case I have scanned all pleadings and emailed them to Ms. Hawkins to make sure that there is no miscommunication on the dates or times that these matters are supposed to be heard. I did provide her at the initial filing of this action, copies of my client's tax returns from 2009 and 2010 and a copy of her D, DRA, and I did it all via, um, email. And, Ms. Hawkins has sent me, um, a pleading via email, as well. So, I don't think there's any problem, with, um, her stated receipt of various documents. She did include in her motion, um a copy of the email that I sent her with

7

the dates and the time and that notice of hearing was attached. Judge, when I arrived on May 9th with my client, um, I was sitting in the courtroom, and I don't know the young lady's name that, that sits here, but she came in and said that we were ready to go, and I said, Ms. Hawkins isn't here yet. And I had told her that I did see Ms. Hawkins earlier that day and it was my understanding that she was coming.

'JUDGE NAFZIGER:  —Okay—

'MS. BUTLER:  – I did not know that she was not going to be here. And I did state that to her and I did state that, uh, Your Honor, when you came out onto the bench. So it should be on the record.

'JUDGE NAFZIGER:  I guess the information that I had that she wasn't coming came from the clerk's office, because she called.'

"49.      Ms. Olberding was in the courtroom and heard the respondent's statements. Following the hearing, Ms. Olberding made a memorandum regarding what transpired in the courtroom. Ms. Olberding's statement includes the following:

'. . . [The respondent] said that she did call the Court on May 9 but claims that she did not tell the Clerk that she nor her client was [*sic*] not appearing, which is what she told me on the phone. She told the Judge that his Court has miscommunications and didn't understand why that was said to him. He asked her that if she didn't tell her client not to show up, why wasn't he here that day? She said that she told him he wasn't needed. The Judge said isn't that the same as telling him not to come? She then hesitated and said yes it was.

'It was an insult and upsetting to sit there and listen to her lies. I would never make anything up and I even notated it in Full Court and informed the Clerk of the conversation afterward on May 9 because the whole conversation in general was odd.'

8

"50.    On June 26, 2012, Connie Milner, Clerk of the District Court of Jefferson County, Kansas, memorialized her conversations with Ms. Olberding regarding the respondent's May 9, 2012, statements. Ms. Milner's memorandum provides:

'I want to respond to the veracity of Michelle Olberding, a deputy clerk in my office, that on the morning of May 9, 2012, she spoke with Joan Hawkins on the phone. After she hung up she immediately turned around and told me that Ms. Hawkins had stated that neither she nor her client would be attending the hearing set for 3:30 that afternoon as she hadn't received proper notice and was still waiting on financial information. I told Michelle to make a note of the conversation in the case which she did.'

"51.    In her initial response to the disciplinary complaint and in her testimony during the formal complaint, the respondent denied stating to Ms. Olberding that neither she nor her client would be appearing at the hearing, as follows:

'My mind was reeling at that point because (1) the hearing was scheduled at 3:30 p.m. (2) I did not recall telling anyone that I did not intend to attend the hearing; and (3) I appeared.

'Rather than believe someone called pretending to be me and told the court I would not be there, the only conclusion I can draw is that there was an error in communication. Regardless of what actually happened I am confident that I did not provide false or inaccurate information to the court or its personnel. My appearance is proof of my intent.'

And, during questioning by Ms. Knoll, the respondent testified as follows:

'Q.    Okay. Had you called the Clerk's Office prior to 3:30 on May 9th?

9

'A.     Yes.

'Q.     And what was the purpose of that call?

'A.     Um, I had called earlier in the day to say if we greed [*sic*] to continue this what would be some possible future dates.

'Q.     And did you have any other discussion?

'A.     I mean, that was the gist of the call.

'Q.     Did you tell them that you were not planning on attending?

'A.     No.

'Q.     Did you tell them that your client was not planning on being there?

'A.     No, at that point I didn't know.'

"52.     Ms. Olberding also testified at the hearing on the formal complaint. Ms. Olberding clearly testified that the respondent stated that she was not going to appear at the hearing that day because she had not received proper notice of the hearing.

"53.     During the hearing, the hearing panel had the opportunity to observe the testimony and demeanor of all of the witnesses. Based upon their personal observations of the witnesses, the hearing panel finds that Ms. Olberding's testimony was credible with supporting corroboration on her actions and character from the chief clerk, Connie Milner. Likewise, the hearing panel finds that the respondent's testimony to lack credibility on this issue.

"DA11637

"54.     On approximately September 29, 2010, M.S. retained the respondent to represent her in a child in need of care action. In April 2012, M.S. informed the respondent that she wished to retain new counsel.

"55.     On April 30, 2012, the case manager in M.S.'s case made written recommendations. M.S. had ten days to file written objections to the case manager's written recommendations.

10

"56.     On May 2, 2012, M.S. left a hand-written note addressed to the respondent at the respondent's office, requesting the return of her file. That same day, on May 2, 2012, the respondent acknowledged that she received M.S.'s request for the return of her file. Knowing of the deadline to file objections to the case manager's recommendations, the respondent told M.S. that her file would not be ready to be picked up until May 10, 2012. The respondent offered to continue the representation until M.S. picked up her file.

"57.     On May 2, 2012, or May 3, 2012, Amy Durkin entered her appearance on behalf of M.S. On May 8, 2012, the respondent acknowledged that she had received Ms. Durkin's entry of appearance.

"58.     On May 10, 2012, pursuant to the respondent's instructions, M.S. picked up her file from the respondent's office. The respondent required M.S. to sign a receipt when she picked up the file. The receipt provided as follows:

> 'This is to certify that on this date I have received the original documents and exhibits I submitted, along with pleadings, exhibits, and correspondence from the law office of J. Hawk Law Ltd.
>
> 'I understand there are certain items to which I cannot directly receive, and those items to-wit: psychological evaluation, police reports, will be forwarded directly to my attorney, Amy Durkin.
>
> 'I have had the opportunity to review the items returned and it does contain those items listed above, less those items that I cannot directly receive.'

The respondent also signed the receipt. Despite the respondent's statement in the receipt, the respondent never forwarded the psychological report or police reports to Ms. Durkin and the respondent still had these in her possession on the date of the hearing, over two and one-half years later.

11

"59.     Ms. Durkin testified that had she timely received the psychological evaluation and police reports, she may have filed objections to the case manager's report, as M.S. was not satisfied with the recommendations. However, she did know for certain that she would have filed written objections because to date, she has never received the reports from the respondent. (Ms. Durkin also testified that because she did not file objections to the case manager's report and that because M.S.'s former husband is no longer having contact with the children, obtaining the psychological report and police reports is no longer necessary for the representation of her client.)

"60.     After retrieving her file from the respondent, on several occasions, M.S. requested an accounting of the advanced fee paid to the respondent and a refund of unearned fees. Despite what can be found in Disciplinary Administrator's Exhibits 45 and 46, M.S. only received three itemized bills from the respondent. Eventually, on July 9, 2012, the respondent returned $691.17 to M.S. Then, on August 13, 2012, the respondent returned an additional $215.00 to M.S. as unearned fees.

"61.     On July 24, 2012, M.S. filed a complaint against the respondent with the disciplinary administrator's office. Leslie Miller, an attorney practicing in Lawrence and a member of the Douglas County Ethics and Grievance Committee was appointed to investigate M.S.'s complaint against the respondent.

"62.     During the investigation, Ms. Miller scheduled an interview of the respondent. Ms. Miller directed the respondent to bring her file regarding her representation of M.S. to the scheduled interview. The respondent did not bring any documents with her to the scheduled interview. When Ms. Miller asked the respondent for her file, the respondent stated that she had provided the original file to M.S. and did not maintain a copy of the file. Later, however, the respondent acknowledged that she did have some electronic mail messages regarding M.S. The respondent did provide Ms. Miller with a couple of electronic mail messages. Ms. Miller's impression was that the respondent did not provide all that she had regarding M.S. Additionally, clearly, the respondent also had billing records pertaining to M.S. that she failed to provide to Ms. Miller at the time of the interview.

12

"63.    At some point, Ms. Miller requested that the respondent provide trust account records. Ms. Miller provided the respondent with a deadline to provide the records. The deadline came and went and the respondent did not provide the requested records. Later, rather than provide trust account records, the respondent provided Ms. Miller with billing records and a 'funds transaction listing.' Ms. Miller clarified that she was seeking trust account records from the bank. Eventually, counsel for the respondent provided Ms. Miller with the trust account records from the bank.

"DA11730

"64.    On August 24, 2012, R.G. filed an action in divorce from his then wife, J.G. Suzanne Valdez and Branden Smith represented R.G.

"65.    Thereafter, on September 21, 2012, the respondent entered her appearance on behalf of J.G. That same day, the respondent filed a parenting plan which purported to outline the wishes of J.G. as they related to custody and parenting time of the couple's four children. In the parenting plan, the respondent sought sole legal custody for J.G., the respondent asserted that R.G. should be allowed limited supervised visitation, and the respondent asserted that custody and parenting time disputes be submitted to a mediator experienced with domestic violence issues. J.G. advised R.G. thereafter that she did not intend to pursue sole legal custody, did not think that his visits needed to be supervised, and did not authorize the respondent to include those statements in the parenting plan.

"66.    After the respondent submitted the parenting plan, on September 26, 2012, counsel for R.G. wrote to the respondent and demanded that the respondent withdraw the parenting plan because it contained false and defamatory statements about R.G.

"67.    On October 1, 2012, counsel for R.G. filed a motion to strike the parenting plan. That same day, the respondent filed a motion to withdraw the temporary parenting plan, a motion to vacate or modify the *ex parte* orders, and a new parenting plan.

13

"68.    On October 2, 2012, the court conducted a hearing regarding the temporary orders and parenting plan. Thereafter, counsel attempted to negotiate the language of the journal entry. Counsel were unable to reach agreements as to language to include on all matters.

"69.    On October 9, 2012, the respondent forwarded a temporary parenting plan and a temporary order to the court for consideration. Ms. Valdez did not sign the temporary parenting plan nor did she sign the temporary order. The respondent's cover letter which accompanied the temporary parenting plan and the temporary order provided as follows:

'I submit the enclosed Temporary Orders and Temporary Parenting Plan following the hearing on October 2, 2012.

'Ms. Valdez and I have exchanged the documents and I submit them with those revisions we have approved, along with our email correspondence reflecting the same.

'There is presently some slight confusion over whether or not your order included any adjustments on the child support worksheet so Ms. Valdez is scheduling a time for us to review the recording. As indicated in the temporary order we will submit a separate order with the child support worksheet, or if we cannot reach a consensus [*sic*] will submit the order pursuant to Rule 170.

'

'Because R.G. is arriving for his first visit this evening we believe we can best promote harmony between the parties if we have these orders approved and filed prior to his arrival.'

"Based upon the respondent's statement that Ms. Valdez approved the language contained in the temporary parenting plan and temporary order, Judge Sally Pokorny entered the two orders. However, Ms. Valdez had not approved the revisions to the

14

temporary parenting plan and the temporary order. Further, additional items in the respondent's cover letter were also false. Ms. Valdez was not scheduling a time for counsel to review the recording of the October 2, 2012, hearing. And, Ms. Valdez did not 'believe' it was necessary to have the orders approved and filed prior the R.G.'s arrival to promote harmony. On the temporary parenting plan and the temporary order which was signed by the respondent and the court, the words 'see email approval' appear where Ms. Valdez' signature should have been.

"70.     On February 4, 2013, the court held a pretrial conference in anticipation of trial scheduled for May 9, 2013. At that time, the court ordered the respondent to provide Ms. Valdez with a copy of the respondent's expert witness report by February 25, 2013. The respondent failed to do so.

"71[a].  On February 15, 2013, Ms. Valdez took J.G.'s deposition. During the deposition, Ms. Valdez asked J.G. a question about what J.G. would like to have to settle the divorce case. The respondent instructed J.G. to not answer that question posed by Ms. Valdez.

"71[b].  On April 1, 2013, the court held a hearing on Ms. Valdez' motion to compel. At that time, the court ordered the respondent to provide a copy of the respondent's expert witness report by April 15, 2013. The respondent failed to do so.

"72.     The respondent finally provided the expert witness report on April 17, 2013. At the time the respondent provided Ms. Valdez with a copy of the expert witness' report, the respondent also provided a copy of the report to the court, in violation of K.S.A. 60-226.

"73.     Ms. Valdez contacted the respondent by electronic mail and requested that the respondent withdraw the report from the court, until the court ordered it to be filed with the court. The respondent did not withdraw the report.

"74.     On April 25, 2013, Ms. Valdez filed a motion to strike J.G.'s expert witness report, to disallow certain testimony, and for sanctions.

15

"75. On April 29, 2013, the court ordered the respondent to produce all documents requested in R.G.'s second request for production of documents. Additionally, the respondent was to forward a 'succinct' settlement proposal to Ms. Valdez or Mr. Smith within 24 hours. The respondent failed to comply with the court's order.

"76. On May 3, 2013, Mr. Smith filed a motion for emergency relief and for sanctions against J.G. and the respondent. In the motion, Mr. Smith alleged that the respondent J.G. was deliberately disobeying the court's order to produce certain documents. The court denied Mr. Smith's motion.

"77. On May 6, 2013, Mr. Smith filed a motion for an order to appear and show cause. Along with the motion, Mr. Smith provided an affidavit which detailed that the respondent violated the court's April 29, 2013, order. On May 7, 2013, the court issued an order to the respondent to appear and show cause. On May 23, 2013, the respondent appeared on the order to show cause. During the hearing, the court instructed Mr. Smith to provide an affidavit detailing his attorney fees if he intended to pursue them. On July 10, 2013, Mr. Smith filed an affidavit of attorney's fee.

"78. On August 14, 2013, the court entered a memorandum decision regarding attorney fees. The memorandum decision included the following:

'Pending in this divorce case is the request for attorney fees by Branden Smith, who represented [R.G.]. [R.G.]'s primary attorney was Suzanne Valdez but Mr. Smith also appeared in court. This case was filed August 4, 2012, [*sic*] and was set for trial on May 9, 2013. Ms. Hawkins represented [J.G.]

'A final pre-trial conference was held on April 29, 2013. Although the case was just shy of 9 months old, all requested discovery had not been produced. Previous motions to compel had been filed by both parties. A motion to compel [J.G.] to comply had been filed and was heard on April 1, 2013.

16

'One issue at the pre-trial conference concerned the then-recent deposition of [J.G.]. Ms. Hawkins had canceled the first deposition. Then when the deposition occurred, Ms. Hawkins directed [J.G.] not to answer questions regarding her position and objectives with regard to debts, assets, and the intended outcome of this case. At the pretrial conference, [R.G.]'s counsel stated that the deposition was long (almost 8 hours) but nevertheless unproductive in that [R.G.] apparently still did not know what [J.G.] was seeking in a settlement or resolution of the case. [J.G.]'s attorney Ms. Hawkins stated that she had directed [J.G.] not to answer deposition questions because settlement discussions are not admissible in court. Ms. Hawkins admitted that she erred in instructing her client not to answer these questions. As far as this Court could discern, it appeared that Ms. Hawkins and her client either did not know what they wanted from this litigation or were not in agreement on that subject. At the time, the Court ordered Ms. Hawkins to provide a settlement statement to [R.G.]'s lawyer within 24 hours.

'[R.G.] also expressed objection to the fact that [J.G.]'s counsel had filed and faxed the expert report to court chambers, when K.S.A. 60-205(d) states that only a certificate of service need be filed for expert disclosures. [R.G.] was concerned that [J.G.] was attempting to bias the Court by supplying premature information, some of which was arguably inadmissible.

'As part of discovery, [R.G.] requested adoption documents in [J.G.]'s possession. Allegations of domestic violence first surfaced in these divorce proceedings. These essentially undocumented allegations resulted in a military investigation of [R.G.]. The couple had adopted two children, ages XX and XX at the time of filing. Since adoption proceedings typically entail written applications, home studies, and in-depth interviews with prospective parents, such adoption files were

17

recent and relevant, could be discovered, and could be potentially important.

'Ms. Hawkins stated that she had not received all the financial documents requested (for the past 10 years), and the Court ordered that the law [*sic*] three years of financial documents at issue be produced. At the pre-trial conference, the Court ordered [J.G.] to produce the adoption records for the parties' children and to provide a settlement offer to [R.G.] within 24 hours, and ordered [R.G.] to produce the additional financial records. At no time did Ms. Hawkins object to producing these documents or claim a privilege.

'The parties agreed to exchange documents at 4:30 p.m. on May 1, 2013. Shortly before 4:30 p.m., Ms. Hawkins emailed that she would not allow Mr. Smith to remove the adoption documents from her office and apparently refused to copy the documents. On May 2, 2013, Ms. Hawkins emailed and said she would produce some documents later that day. On May 3, 2013, Ms. Hawkins delivered the adoption document, which delivery contained 64 pages of typed information, plus 45 blank pages scattered throughout the document. Upon review, Mr. Smith declared that documents were missing from the adoption files and the files were incomplete. Mr. Smith then filed an *ex parte* motion for emergency relief and sanctions, which the court denied. In that motion, he requested attorney fees, as well as seeking [sic] strike [J.G.]'s defense of fault in the marriage.

'Upon the court's refusal to grant an *ex parte* hearing for emergency relief, Mr. Smith then filed an affidavit and Motion for an Order to Appear and Show Cause why she should not be found in indirect contempt, which repeated many of the foregoing issues. The contempt matter was heard in May 23, 2013. In the meantime, the parties announced a settlement agreement in court on May 9, 2013. The agreement was detailed, but the parties had difficulty in drafting a journal

18

entry based upon the settlement agreement they had reached. At the contempt hearing, many requests were moot, because the parties had settled the matter. The Court took the issue of attorney fees under advisement. On July 10, 2013, Mr. Smith filed an affidavit and bill further detailing the time he had claimed in previous motions related to discovery issues and motions regarding the same, at a rate of $175/hr.

'The Court will grant attorney fees in this case, pursuant to K.S.A. [2013 Supp.] 60-237(b)(2)(C). That provision states that if a party or a party's officer fails to obey an order to provide or permit discovery, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." The [J.G.] and her attorney did not offer a substantial justification for this delay.

'This Court does not expect to hear so many last-minute discovery motions in a given case and hear that a lawyer instructed her client not to answer repeated valid questions at a deposition or hear that a lawyer agreed in court to produce a document and was ordered to produce the document but ultimately sent 45 blank pages in a document without lodging any formal objection to producing it. The Court has reviewed Mr. Smith's affidavit requesting 15.6 billable hours for $2,730.00. The court attributes 9 hours to the failure of Ms. Hawkins to turn over discovery and awards attorney fees to Mr. Smith of $1,575.00, (9 hours @ $175/hr.), to be paid by Ms. Hawkins. The Court assesses the fees against Ms. Hawkins, the attorney, because [J.G.] provided the documents to her attorney, who did not turn them over. Ms. Hawkins is directed to pay these fees in 60 days.'

"79.    On August 23, 2013, the respondent appealed the court's order.

19

"80.     In the divorce decree, the court awarded marital property located in Alabama to R.G. The court ordered J.G. to execute a quit claim deed in favor of R.G. J.G. executed the quit claim deed and provided it to the respondent. During the pendency of the appeal, the respondent refused to turn over the quit claim deed to opposing counsel until a journal entry and other court orders were agreed to. In the spring 2014, after the disciplinary administrator's office became involved, the respondent finally turned over the quit claim deed.

"81.     On November 18, 2013, Ms. Valdez filed a motion for an involuntary dismissal of the appeal. Thereafter, on December 9, 2013, the Kansas Court of Appeals granted Ms. Valdez' motion and dismissed the appeal. However, on December 27, 2013, the respondent filed a motion to reinstate the appeal. Ms. Valdez did not respond to the respondent's motion and the court reinstated the appeal.

"82.     To date, the respondent has not paid the sanction of attorney fees ordered by the district court as the issue remains pending on appeal before the Kansas Court of Appeals.

"DA11918

"83.     Following a court hearing on October 12, 2012, G.P. met with the respondent seeking representation in a protection from abuse case filed by T.S. Additionally, G.P. sought to retain the respondent to seek to obtain grandparent visitation rights. On October 15, 2012, the respondent ran a conflict check. The respondent's check did not reveal a conflict. G.P. paid the respondent $1,100 for the representation.

"84.     On October 29, 2012, the respondent wrote to G.P. detailing the terms of the representation. On October 31, 2012, the respondent entered her appearance on behalf of G.P. At that time, a hearing was scheduled for November 13, 2012, in the protection from abuse case.

"85.     At some point, G.P. told the respondent she needed 10 to 14 days advance notice to arrange for transportation to and from scheduled hearings. G.P. did not

20

tell the respondent that she could not attend court hearings because she did not have transportation. She simply told the respondent that she needed advanced notice to make necessary arrangements.

"86.     The respondent and Bethany Roberts, opposing counsel, agreed to continue the hearing. The respondent prepared and signed an agreed order. The respondent forwarded the order to Ms. Roberts who also signed the order. Later, the court entered the order and continued the hearing to January 3, 2013. However, the respondent failed to inform G.P. that the case had been continued and on November 13, 2012, G.P. traveled from Eudora, Kansas, to the Shawnee County District Court for the hearing.

"87.     On December 29, 2012, the respondent sent an electronic mail message to Ms. Roberts. In the message, the respondent stated:

'My client informs me that she has difficulty with transportation. Wondering if you would be agreeable to reschedule if she cannot be there on the 3rd.

'I am meeting with her Monday about your proposed agreed order. Honestly don't think she is going to agree but will see.'

At no time, did G.P. tell the respondent that she could not attend the hearing on January 3, 2013, because of a lack of transportation.

"88.     On December 31, 2012, the respondent and G.P. spoke by telephone. The respondent informed G.P. that she was going to visit with Ms. Roberts about the hearing and would be in touch. The respondent did not call G.P. prior to the hearing.

"89.     Because the respondent informed her that G.P. was unable to attend the hearing because of transportation problems, Ms. Roberts agreed to continue the hearing scheduled for January 3, 2013.

21

"90.    On January 3, 2013, G.P. repeatedly called the Shawnee County District Court to ask whether the hearing remained scheduled to be heard that day. G.P. was repeatedly told that the hearing was proceeding that day, as an order continuing it had not been entered. On January 3, 2013, the court called G.P.'s case. Ms. Roberts informed the court, based upon the respondent's statements, that G.P. was unable to attend the hearing due to transportation problems and that Ms. Roberts had agreed to present the respondent's agreed order to continue the case on the respondent's behalf. At that time, G.P. stood up in the courtroom and announced her presence. The court continued the hearing to February 5, 2012.

"91.    On January 16, 2013, T.S. informed Ms. Roberts that the respondent had previously represented her. Thereafter, Ms. Roberts informed the respondent of the conflict. At that time, the respondent did not inform G.P. of the conflict.

"92.    On February 3, 2013, Ms. Roberts informed the respondent that T.S. declined to waive the conflict. On February 5, 2012, the date of the next scheduled hearing, the respondent filed a motion to withdraw from the representation due to the conflict of interest. G.P. first learned of the conflict on February 5, 2013, when the respondent sought to withdraw from the representation.

"*Conclusions of Law*

"93.    Based upon the findings of fact, the hearing panel concludes as a matter of law that in DA11619, the respondent violated KRPC 3.2, KRPC 3.3, KRPC 8.4(c), and KRPC 8.4(d); in DA11637, the respondent violated KRPC 1.16(d) and KRPC 8.1(b); in DA11730, the respondent violated KRPC 3.2, KRPC 3.3, KRPC 3.4, KRPC 8.4(c), and KRPC 8.4(d); and in DA11918, the respondent violated KRPC 3.3, as detailed below. [Footnote:  In addition, Ms. Knoll alleged that the respondent also violated KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.9, KRPC 1.15, and KRPC 3.1. The hearing panel concludes as a matter of law that clear and convincing evidence was not presented to establish that the respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.9, KRPC 1.15, and KRPC 3.1. Accordingly, the hearing panel dismisses the allegations that

22

the respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.9, KRPC 1.15, and KRPC 3.1.]

"KRPC 1.16

"94.    KRPC 1.16 requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, KRPC 1.16(d) provides as follows:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

The respondent violated KRPC 1.16(d) in connection with her termination of representation of M.S. In that case, the respondent failed to timely provide the psychological report and police reports to Ms. Durkin in DA11637. Further, the respondent delayed in providing the file to M.S. when M.S. had only 10 days to determine whether to file written objections to the case manager's written recommendations. Finally, the respondent failed to timely refund unearned fees to M.S. As such, the hearing panel concludes that the respondent violated KRPC 1.16(d) in connection to the respondent's termination of representation of M.S.

"KRPC 3.2

"95.    An attorney violates KRPC 3.2 if she fails to make reasonable efforts to expedite litigation consistent with the interests of his client. The respondent failed to expedite litigation in two cases.

"96.    First, the respondent engaged in a number of activities that resulted in unnecessary delay in considering the issues pending in B.S.'s case. The respondent failed

23

to timely respond to requests from opposing counsel to negotiate a settlement or schedule a hearing, which caused delay. Further, by informing the court's clerk that neither she nor her client would not be appearing in court at the May 9, 2012, scheduled hearing caused the court to review unnecessary motions and hold unnecessary hearings and caused an unnecessary delay in resolving the pending issues between B.S. and A.S.

"97.    Second, in her representation of J.G., the respondent failed to expedite the litigation consistent with the interests of her client. The respondent filed a temporary parenting plan which did not reflect the interests or the position of J.G. After filing the initial temporary parenting plan, the respondent had to file a motion [sic] withdraw that plan which delayed consideration of a parenting plan which did accurately reflect the interests and position of her client. Further, the respondent violated KRPC 3.2 when she withheld the quit claim deed in an attempt to remove the sanctions that the court entered against her personally.

"98.    The respondent's obstructionist approach to the practice of law in B.S.'s case and J.G.'s case caused unnecessary delay. Accordingly, the hearing panel concludes that the respondent violated KRPC 3.2, by failing to expedite litigation.

"KRPC 3.3

"99.    'A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.' KRPC 3.3(a)(1). In this case, the respondent violated KRPC 3.3(a)(1) in three separate cases.

"100.    First, the respondent repeatedly made false statements of material fact in the B.S. case. The respondent made false statements in pleadings filed with the court and on the record in B.S.'s case when she denied informing the court clerk that neither she nor her client would be attending the hearing as she had not received proper service. The respondent's statements were false, material, and made to the court. As such, the hearing panel concludes that the respondent made false statements of material facts to a tribunal in B.S.'s case, in violation of KRPC 3.3(a)(1).

24

"101. Second, the respondent made false statements of material fact in her representation of J.G. In that case, when the respondent informed the court that Ms. Valdez approved the temporary parenting plan and the temporary order when she had not. Ms. Loveland additionally testified that during her investigation the respondent admitted that there was not an agreement on everything. Thus, the respondent made false statements of material fact, in violation of KRPC 3.3(a)(1).

"102. Finally, in G.P.'s case, respondent informed Ms. Roberts that G.P. could not attend the hearing because G.P. did not have transportation to the hearing. That statement was false and the respondent knew the statement was false, as G.P. told the respondent that she needed 10 to 14 days' notice to make transportation arrangement. At the time the respondent informed Ms. Roberts that G.P. could not attend the hearing due to transportation difficulties, the respondent reasonably should have expected that Ms. Roberts would explain the reason for the continuance to the judge. At no time, did the respondent inform the court (or Ms. Roberts, for that matter) that the statement that G.P. could not attend the hearing due to transportation difficulties was false.

"103. Accordingly, the hearing panel concludes that the respondent repeatedly made false statements to tribunals and, in addition, caused false statements to be made to a tribunal, in violation of KRPC 3.3(a)(1).

"KRPC 3.4

"104. 'A lawyer shall not . . . in pretrial procedure, make a frivolous discovery request or fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party.' During J.G.'s deposition, the respondent improperly directed J.G. to refuse to answer questions regarding what J.G. sought during the divorce proceeding. The information sought by opposing counsel was proper discovery – it was sought in an attempt to resolve the pending divorce proceeding. Further, the respondent failed to comply with the court's order regarding the discovery of the adoption records. By instructing her client to refuse to answer deposition questions

25

and by failing to comply with the court's order regarding the adoption records, the respondent violated KRPC 3.4(d) in her representation of J.G.

## "KRPC 8.1

"105.    Lawyers must cooperate in disciplinary investigations. KRPC 8.1(b) provides the requirements in this regard. '[A] lawyer in connection with a . . . disciplinary matter, shall not: . . . knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority . . .' KRPC 8.1(b). The respondent knew that she was required to cooperate in the disciplinary investigation and provide the documents and records as directed by the attorney investigator. The respondent failed to provide her file and trust account records as directed by Ms. Miller during the investigation of M.S.'s complaint. Because the respondent knowingly failed to cooperate in the investigation, the hearing panel concludes that the respondent violated KRPC 8.1(b).

## "KRPC 8.4(c)

"106.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty in two cases: B.S.'s case and J.G.'s case.

"107.    First, the respondent engaged in dishonest conduct in her representation of B.S. when she falsely stated in pleadings and in open court that she did not tell the court clerk that neither she nor her client would be appearing at a hearing on May 9, 2012, because she had not received proper service. Further, the respondent engaged in dishonest conduct when she made the same statement in her initial response to the complaint filed regarding her representation of B.S.

"108.    Also, the respondent engaged in dishonest conduct in her representation of J.G. when she falsely informed Judge Pokorny that Ms. Valdez had approved the temporary parenting plan and the temporary orders in electronic mail messages.

26

"109.    As such, the hearing panel concludes that the respondent violated KRPC 8.4(c) in her representation of B.S. and J.G.

"KRPC 8.4(d)

"110.    It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice. KRPC 8.4(d). In two cases, B.S.'s case and J.G.'s case, the respondent engaged in conduct that was prejudicial to the administration of justice.

"111.    The respondent engaged in conduct that is prejudicial to the administration of justice when she attempted to impugn Ms. Olberding's reputation by stating that Ms. Olberding miscommunicated what the respondent stated on the telephone. Further, the respondent engaged in conduct that is prejudicial to the administration of justice when she told her client that his appearance was not necessary. Had the respondent refrained from telling the clerk that neither she nor her client would be appearing and had the respondent refrained from telling her client that his appearance was not necessary, the district court could have resolved the outstanding issues remaining in B.S. and A.S.'s case. As it was, the court could not proceed based solely on the respondent's misconduct.

"112.    Likewise, the respondent engaged in conduct which was prejudicial to the administration of justice when she refused to turn over the quit claim deed executed by J.G. to opposing counsel which would allow R.G. to sell the Alabama property. Further, the respondent engaged in conduct which was prejudicial to the administration of justice when she directed her client to refuse to answer questions in the deposition regarding what J.G. wanted in the divorce proceeding by way of settlement. Finally, the respondent engaged in the conduct which was prejudicial to the administration of justice when she failed to comply with the court's order regarding discovery relating to the adoption records.

"113.    As such, the hearing panel concludes that the respondent repeatedly violated KRPC 8.4(d) in her representation of B.S. and J.G.

27

"114.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"115.    *Duty Violated*. The respondent violated her duty to her client to properly terminate representation. The respondent violated her duty to the public to maintain her personal integrity. Finally, the respondent violated her duty to the legal system to expedite litigation consistent with the interests of her client.

"116.    *Mental State*. The respondent knowingly violated her duties.

"117.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to her clients, the legal profession, and the legal system.

      a.      Ms. Butler testified directly regarding the injury suffered both by her client and by the legal system. According to Ms. Butler, her client, B.S., incurred additional legal fees as a result of the respondent's misconduct and, additionally, B.S. unnecessarily missed a school session to appear in court, when the respondent had informed the clerk's office that she would not be appearing. Ms. Butler also testified that the legal system was injured by the respondent when the respondent used an impertinent tone with the court and attacked both Ms. Butler and Ms. Olberding.

      b.      The respondent's misconduct in DA11730 resulted in injury to the legal system and to the parties. Specifically, the respondent's actions frustrated the forward action of the case, increased confusion between the parties, and frustrated the court.

"118.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"119.    *Prior Disciplinary Offenses*. The respondent has been previously disciplined on one occasion. On June 1, 2012, the respondent entered into the attorney diversion program, under Kan. Sup. Ct. R. 203(d), for violations of KRPC 1.3 and KRPC 1.4. Whether the respondent successfully completed the terms and conditions of the diversion agreement is disputed by the parties. However, it is not necessary for the hearing panel to resolve that issue, as the respondent's participation in the attorney diversion program was offered only as a matter of aggravation.

"120.    *A Pattern of Misconduct*. The respondent engaged in a pattern of misconduct. A common theme that runs throughout the four cases presently before the hearing panel is obstruction. In the hearing panel's estimation, it appears that the respondent repeatedly engaged in subterfuge in order to either increase her billable fees to her client or to cause unnecessary and unreasonable delay in handling pending matters. Regardless of the respondent's motivation, the pattern of obstructing justice causes the hearing panel serious concern.

"121.    *Multiple Offenses*. The respondent committed multiple rule violations in four cases. The respondent violated KRPC 1.16, KRPC 3.2, KRPC 3.3, KRPC 3.4, KRPC 8.1, KRPC 8.4(c), and KRPC 8.4(d). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"122.    *Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process*. The respondent failed to comply with Ms. Miller's requests in investigating M.S.'s complaint. The respondent's failure to cooperate is an aggravating factor in this case.

29

"123.  *Refusal to Acknowledge Wrongful Nature of Conduct*. The respondent has refused to acknowledge that her conduct violated the Kansas Rules of Professional Conduct. The respondent's refusal to acknowledge any wrongdoing or accept responsibility for her actions further aggravates an already serious case of attorney misconduct.

"124.  *Indifference to Making Restitution*. To date, the respondent has not paid the sanction ordered by the district court in J.G.'s divorce case. However, the respondent appealed the order to pay Mr. Smith's attorney fees and the appeal remains pending. Also, in DA11637, the respondent has not returned materials from the client's file as requested more than 2 1/2 years ago.

"125.  In addition to the factors listed above, the hearing panel also notes that the record was void of any 'good character' evidence. Rather, seven attorneys in her legal community testified and all seven testified to problems or negative experiences in working with the respondent. Specifically, both Ms. Butler and Ms. Durkin testified that because of past difficulties, they employ different methods of correspondence with the respondent than they do with other attorneys. Specifically, Ms. Butler and Ms. Durkin both testified that all correspondence with the respondent is done in writing to preserve a record of communication.

"126.  Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found no mitigating circumstances present.

"127.  In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'5.11    Disbarment is generally appropriate when:

....

'(b)    a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

'5.13    Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.22    Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

"128.[a]   The disciplinary administrator recommended that the respondent be indefinitely suspended from the practice of law or disbarred. On the other hand, the respondent recommended that she be allowed to continue to practice law.

"129.[a]   The hearing panel considered that there were four separate cases with rule violations, in addition to past discipline. The hearing panel considered that the respondent's violations injured her clients, opposing parties, attorneys, judges, courthouse staff, and, in general, the legal profession.

"128.[b]   The standards which are applicable in this case provide for a wide range of appropriate discipline—from reprimand to disbarment. While the hearing panel is certain that reprimand is not a sufficient discipline to recommend given the serious nature of the misconduct, the hearing panel is also likewise certain that disbarment is not warranted. The respondent engaged in serious misconduct. And, serious misconduct calls for serious discipline. In this case, the hearing panel unanimously recommends that the respondent be suspended from the practice of law. The hearing panel is divided, however, as to the length of the suspension.

"129.[b]   Based upon the above findings of fact, conclusions of law, aggravating factors, and the lack of mitigating factors, a majority of the hearing panel recommends that the respondent be suspended for a period of 18 months.

"130.   Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

The panel's presiding officer dissented from the recommended suspension period of 18 months, believing that a suspension period of 1 year was more appropriate.

The respondent filed exceptions to the final hearing report, arguing that the Disciplinary Administrator's office failed to establish by clear and convincing evidence

that she violated any rule. Consequently, she also argued that the recommended discipline of 18 months' suspension was unwarranted. She raised these issues in her subsequent brief. They will each be addressed in turn.

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). This court does not reweigh the evidence or assess the credibility of witnesses. *In re Comfort*, 284 Kan. 183, 190, 159 P.3d 1011 (2007). "Rather, this court examines any disputed findings of fact and determines whether clear and convincing evidence supports the panel's findings. [Citation omitted.] If so, the findings will stand." *In re Trester*, 285 Kan. 404, 408-09, 172 P.3d 31 (2007).

Hawkins was given adequate notice of the formal complaint, to which she filed an answer, and adequate notice of the hearing before the panel and the hearing before this court.

33

A.   *KRPC 1.16(d)*

Hawkins argues that the panel erred in concluding that her conduct in winding up her representation of M.S. in DA11637 constituted a violation of KRPC 1.16(d) (2015 Kan. Ct. R. Annot. 573). The rule states:

> "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law."

The panel concluded that Hawkins violated KRPC 1.16(d) by (1) failing to provide the psychological evaluation and police report to Amy Durkin, M.S.'s subsequent attorney; (2) taking 8 days to provide M.S. with the file when she only had 10 days to file objections to the case manager's recommendations; and (3) failing to timely refund unearned legal fees to M.S.

1.   *The Case File, the Psychological Evaluation, and the Police Report*

Hawkins claims that her delay in providing the case file to M.S. and her failure to provide Durkin with the psychological evaluation and the police report (contained within the case file) can be explained by the fact that M.S. only made one request for her file—on May 2, 2012—and that prior to picking up her file on May 10, 2012, she informed Hawkins that she would not be filing an objection to the case manager's recommendations, apparently indicating to Hawkins that a quick transfer of the case file, including the evaluation and police report, was not essential to protecting M.S.'s interests. Hawkins further claims that she called Durkin on May 9, 2012, regarding the evaluation

34

and report but that Durkin never returned her call. Hawkins also points out that Durkin testified before the panel that the evaluation and report were no longer needed because she never filed objections to the case manager's recommendations and that M.S.'s former husband was no longer having contact with their children.

The record shows that on April 30, 2012, the case manager in M.S.'s case mailed and emailed her written recommendations to the parties and to the judge presiding over the case. It appears that the recommendations were entered into the district court's filing system on May 3, 2012. And the recommendations were not approved by the judge until May 21, 2012.

On Wednesday, May 2, 2012, M.S. left a hand-written note at Hawkins' office, requesting her case file "as soon as possible." The note did not mention anything about M.S. wishing to terminate Hawkins as her attorney. That same day at 3:08 p.m., Hawkins wrote M.S. an email, acknowledging that she had received M.S.'s request and informing her that the file would be ready for her to pick up on May 10, 2012. In the email, Hawkins also stated:

> "In the meantime do you want me to follow through on any of the matters we discussed?
>
> "1.    Communicating to Trina [the case manager] a mea culpa
> "2.    Speaking with the Guardian ad Litem to see if she will agree with the objection re continuing case management
> "3.    *Preparing the objection*
> "4.    Any other matters
>
> "Please advise." (Emphasis added.)

Hawkins sent the same email later that day at 9:54 p.m.

Though Durkin testified that she entered her appearance as M.S.'s attorney on May 2 or 3, records from the Douglas County District Court indicate that she entered her appearance on May 4.

At 11:46 a.m. on Monday, May 7, Hawkins sent another email to M.S., stating: "I did not receive a response so I assume you do not wish for me to take any further action and will assume my representation has been terminated, unless I hear otherwise from you." Later that day at 2 p.m., Hawkins forwarded to M.S. the email she had sent her twice on May 2. At the top of the email, Hawkins noted that the message had "been previously sent three times," that "at least one of them was returned," and that she was looking forward to M.S.'s response.

At 6:58 p.m. on May 7, M.S. finally responded to Hawkins' emails, informing her that she would be at Hawkins' office on May 10 to pick up the case file. In the email, M.S. specifically told Hawkins that there was "[n]o need to prepare an objection." M.S. apologized for "the slow reply," noting that she had "been in KC today, and not home."

At 2:12 p.m. on May 8, Hawkins sent an email to Durkin, noting that she had received Durkin's entry of appearance. Hawkins also wrote: "Do you want to pick up the file so I can answer your questions or do you prefer I give it to [M.S.]?" Five minutes later, Durkin replied to the email, stating: "It is fine if you give it to [M.S.]. I don't think that I have any questions right now." Phone records indicate that Hawkins placed a 2-minute call to Durkin's office in Eudora on May 9.

On May 10, 2012, M.S. picked up the file from Hawkins' office. Hawkins required M.S. to sign a receipt when she picked up the file. The receipt stated:

"This is to certify that on this date I have received the original documents and exhibits I submitted along with pleadings, exhibits, and correspondence from the law office of J. Hawk Law Ltd.

"I understand there are certain items to which I cannot directly receive, and those items to-wit: psychological evaluation, police reports, will be forwarded directly to my attorney, Amy Durkin.

"I have had the opportunity to review the items returned and it does contain those items listed above, less those items that I cannot directly receive."

Ultimately, Hawkins admitted in her testimony before the panel that she never forwarded the psychological evaluation or the police report to Durkin and that both documents were still in her possession. Durkin testified that though M.S. was not completely satisfied with the case manager's recommendations, objections were never filed due to the short timeframe for doing so. Durkin also testified that she did not become aware of the existence of the psychological evaluation or the police report until she spoke with the Disciplinary Administrator's office regarding M.S.'s complaint. Durkin stated that had she timely received the psychological evaluation (presumably a document she has never reviewed), she may have filed objections to the case manager's recommendations. At the time of her testimony before the hearing panel (October 9, 2014), Durkin noted that having the documents now within her file was unimportant to her current representation of M.S., considering that M.S. had sole legal custody of the children and that her ex-husband was no longer having contact with the children.

Though the parties agree that M.S. had 10 days to file objections to the recommendations, neither party explains when the time period began to run or whether only business days or all days were counted for purposes of determining the 10-day

period. Thus, it is unclear when the exact deadline was for M.S. to file her objections. Consequently, this makes it difficult to judge whether Hawkins' transfer of the case file to M.S. on May 10, 2012, was reasonable under the circumstances. Regardless, the evidence above indicates that when Hawkins received M.S.'s written request for her case file on May 2, Hawkins responded via email that same day, informing M.S. that she could pick up her case file on May 10 and asking her whether she wanted Hawkins, among other things, to prepare the objections to the case manager's recommendations. If Hawkins, as her May 2 email indicates, was acting under the assumption that she would be preparing the objections for M.S., then it certainly cannot be said that she acted unreasonably by setting May 10 as the date for M.S. to pick up her case file. Furthermore, when M.S. finally responded to Hawkins' numerous emails on May 7, M.S. expressed no concern with picking up her case file on May 10 and told Hawkins that there was no need to prepare objections. Under these facts, it cannot be said that Hawkins failed to "take steps to the extent reasonably practicable to protect" M.S.'s interests. See KRPC 1.16(d).

Though Hawkins' transfer of the case file to M.S. on May 10 does not appear to constitute a violation of KRPC 1.16(d), the same cannot be said of Hawkins' failure to forward the psychological evaluation or the police report to Durkin. Though hindsight shows that M.S. was not harmed by Hawkins' failure to forward the documents to Durkin, it does not change the fact that under KRPC 1.16(d), Hawkins had a duty to timely forward the documents to Durkin. Hawkins could not provide the hearing panel with a valid reason for why she still retained the documents. Accordingly, we find sufficient evidence in the record to sustain the hearing panel's conclusion that Hawkins violated KRPC 1.16(d) by failing to forward the documents to Durkin.

## 2. *Returning Unearned Legal Fees to M.S.*

In Hawkins' answer to the complaint, she admitted that M.S., at the time she terminated Hawkins as her attorney, requested a refund of the unearned fees she had advanced to Hawkins. The record shows that between June 11 and July 9, 2012, M.S. called Hawkins' office numerous times requesting an accounting and a refund of any unearned fees. In her answer to the complaint, Hawkins admitted that on July 9, 2012, she sent M.S. a check in the amount of $691.17. On August 13, 2012, Hawkins sent M.S. a billing statement, a letter, and a check for $215. This amount included 1 hour of time ($185) that was withheld from the first refund plus a credit of $30.

In an apparent attempt to explain the delay in refunding the unearned fees to M.S., Hawkins states that "when M.S. requested her refund, Hawkins informed M.S. she was providing a full accounting" and that "[a]fter the full accounting, Ms. Hawkins did return all of her unearned fees to M.S." Regardless of whether this is true, it does not change the fact that it took Hawkins 3 months after her representation of M.S. had ended to refund M.S. all of her money. Hawkins does not explain in her brief why a "full accounting" would take so long. Accordingly, we find sufficient evidence in the record to sustain the hearing panel's conclusion that Hawkins violated KRPC 1.16(d) by failing to timely refund unearned legal fees to M.S.

## B. *KRPC 3.2*

KRPC 3.2 (2015 Kan. Ct. R. Annot. 595) states: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." Hawkins argues that the panel erred in concluding that she violated KRPC 3.2 by taking an "obstructionist approach to the practice of law" in B.S.'s case (DA11619) and J.G.'s case (DA11730) which "caused unnecessary delay."

39

1.      *Hawkins' Representation of B.S.*

The panel found that in B.S.'s case, the respondent caused delay by failing to timely respond to requests from Julia Butler, her opposing counsel, to negotiate a settlement or schedule a hearing, and by informing Michelle Olberding, the deputy court clerk, that neither she nor her client would be appearing at the May 9, 2012, hearing, which in turn "caused the court to review unnecessary motions and hold unnecessary hearings and caused an unnecessary delay in resolving the pending issues between B.S. and A.S."

With regard to the finding that Hawkins failed to timely respond to Butler, Hawkins simply states that the "Panel's Report does not support such a finding." She then proceeds to give a recitation of the evidence without any explanation of why it does not establish her tardiness in responding to opposing counsel's emails. Despite reciting this evidence, Hawkins also states that "the complaint filed in DA11619, alone, does not rise to the level of clear and convincing evidence," apparently suggesting that the complaint Butler filed with the Disciplinary Administrator was the only evidence presented at the hearing to show that Hawkins was tardy with her responses. The problem with Hawkins' argument is that Butler testified before the hearing panel regarding the trouble she had communicating with Hawkins. Copies of the emails at issue were also introduced into evidence at trial verifying the panel's findings.

Hawkins, curiously, argues that because there was conflicting evidence (*i.e.*, her testimony versus the testimony of Olberding, the deputy clerk of the Jefferson County District Court), the panel could not have found by clear and convincing evidence that she informed Olberding on the morning of May 9, 2012, that neither she nor her client would be attending the hearing scheduled later that day. Simply stated, the panel made a

40

credibility determination, finding the deputy clerk more credible than Hawkins. On appeal, this court does not reweigh the evidence or assess the credibility of witnesses. *In re Comfort*, 284 Kan. at 190. The panel had sufficient evidence before it to find that it was highly probable that Hawkins told the deputy clerk that neither she nor her client would be appearing for the May 9 hearing.

2.      *Hawkins' Representation of J.G.*

The hearing panel concluded that Hawkins, by filing a temporary parenting plan which did not reflect the interests or the position of J.G., failed to expedite litigation consistent with the interests of her client. The panel noted that after filing the initial temporary parenting plan, Hawkins had to file a motion to withdraw that plan which delayed consideration of a parenting plan which did accurately reflect the interests and position of J.G. The panel also concluded that Hawkins violated KRPC 3.2 when she refused to turn over the quitclaim deed to R.G. in an attempt to remove the sanctions that the court entered against her personally.

Hawkins attacks the panel's findings regarding the temporary parenting plan by arguing that the findings were taken solely from the original complaint that Suzanne Valdez (opposing counsel in the underlying matter) filed against her. Hawkins then proceeds to argue that the temporary parenting plan "accurately reflected J.G.'s wishes and concerns" and that Hawkins and J.G. decided to withdraw "the plan for strategic reasons because R.G. threatened and harassed J.G. after the proposed plan was filed."

Though Hawkins is correct that the hearing panel based its factual findings regarding the temporary parenting plan on information contained within Valdez' complaint, she fails to acknowledge that Valdez' testimony (via deposition) was presented as evidence to the hearing panel and was consistent with the allegations Valdez

41

made within her complaint. She also fails to acknowledge that attached to the complaint was documentary evidence (*e.g.*, portions of an email from J.G. to R.G.) indicating that the initial parenting plan did not reflect J.G.'s wishes. Though Hawkins testified before the hearing panel that the parenting plan did accurately reflect the matters that she had discussed with J.G., Hawkins was unable to confirm that J.G. had reviewed the parenting plan before Hawkins had filed it with the court. Notably, the record indicates Hawkins mailed the parenting plan to J.G. on the same day she filed it with the court. Despite Hawkins' testimony to the contrary, the panel had evidence before it showing that it was highly probable that the parenting plan Hawkins filed did not reflect the wishes of her client.

With regard to the quitclaim deed, the hearing panel found that the district court, within its divorce decree,

> "awarded martial property located in Alabama to R.G. The court ordered J.G. to execute a quit claim deed in favor of R.G. J.G. executed the quit claim deed and provided it to the respondent. During the pendency of the appeal, the respondent refused to turn over the quit claim deed to opposing counsel until a journal entry and other court orders were agreed to. In the spring, 2014, after the disciplinary administrator's office became involved, the respondent finally turned over the quit claim deed."

Based on this finding, the panel concluded that Hawkins violated KRPC 3.2 when she withheld the quitclaim deed in an attempt to remove the sanctions that the court entered against her personally.

As can be discerned from the hearing panel findings in DA11730, the divorce case between J.G. and R.G. was, to put it mildly, a contentious affair. Highly summarized, the record indicates that the parties eventually entered mediation, reached what they thought

was an agreement on how to settle the case, but then could not agree on the exact language needed to memorialize their agreement. Accordingly, pursuant to Rule 170(d) (2015 Kan. Ct. R. Annot. 264), the parties submitted their competing drafts of their agreement to the district court so it could settle the matter, resulting in the district court filing the divorce decree mentioned above on July 24, 2013. Though the divorce decree awarded a home located in Alabama to R.G., there is no specific order within it commanding J.G. to execute a quitclaim deed in R.G.'s favor. Valdez indicated that R.G. wanted the quitclaim deed so he could sell the home.

In addition to the divorce decree, the district court filed a memorandum decision on August 14, 2013, ordering Hawkins to pay $1,575 in attorney fees in connection with her supposed failure to comply with a court order to make available to R.G.'s attorneys adoption records of the couple's children.

On August 22, 2013, Hawkins filed a notice of appeal, challenging (1) the divorce decree on the basis that it did not reflect the entirety of the parties' agreement and (2) the order for her to pay attorney fees. On September 10, 2013, Valdez filed a notice of cross-appeal, challenging "certain judgments entered herein on July 24, 2013; and all previous rulings on all issues decided therein to the Kansas Court of Appeals."

While this appeal was pending, the parties returned to mediation to work out their remaining differences. It must be pointed out that the issues addressed in mediation were solely those involving R.G. and J.G.; mediation did not address the attorney fee sanction personally levied against Hawkins. Highly summarized, in October 2013, Valdez and Hawkins exchanged numerous emails indicating that R.G. and J.G. had reached a settlement. The attorneys discussed how to memorialize and file the settlement with the district court and what actions each party needed to take in order to implement their agreement (*e.g.*, J.G. executing a quitclaim deed and delivering it to R.G.). The attorneys

43

also discussed what impact the settlement should have on the appeal pending before the Court of Appeals. Valdez believed that the settlement should result in a voluntary dismissal of the entire appeal. Hawkins disagreed, noting that though R.G. and J.G.'s settlement may have rendered as moot any appellate issues concerning the divorce decree, the attorney fee sanction was still at issue. Thus, Hawkins refused to dismiss the appeal.

One email in particular, an email Hawkins wrote to Valdez on October 17, 2013, detailed Hawkins' understanding of the tasks that needed to be completed by both sides in order to implement the parties' agreement. The email also demonstrates Hawkins' understanding of what impact the parties' settlement should have on the pending appeal. Because the Disciplinary Administrator relies solely on this email to argue that Hawkins attempted to coerce Valdez into abandoning the attorney fee sanction in exchange for Hawkins agreeing to deliver the quitclaim deed to Valdez' client, the email is quoted in its entirety:

"Suzanne,

"I, like you, am pleased that Susan Kraus was able to work with the parties to resolve the majority of the outstanding issues in mediation. I have reviewed the memorandums of understanding with my client and she expresses a desire that once these MOUs are filed that there are no loose ends. The loose ends presently are: (1) The Military Retired Pay Court Order, (2) the agreed Parenting Plan signed by the parties, (3) assurance there will be no modification of maintenance award, (4) quit claim deed, (5) LES statements.

"I am seeking your cooperation to get all of these matters wrapped up and the necessary paperwork on file with District Court and the Court of Appeals by Thursday of next week.

44

"I propose the journal entry incorporating the Memorandum of Understanding regarding the Supplement to Property Settlement Agreement also incorporate by reference the agreed parenting plan (I have the original signed by both parties), Military Retired Pay Court Order, and a second Supplement to Property Settlement Agreement that incorporates the financial awards contained in the Decree of Divorce and Journal Entry of Final Settlement into the parties mutual agreement. That eliminates the possibility of either party revisiting the property settlement terms and *would make the appeal addressing those issues moot with or without a dismissal*.

"The journal entry should contain a space for both of our signatures as well as the judge so that once ordered [sic] becomes incorporated into the Decree of Divorce[.] Before the journal entry is filed in District Court along with the aforementioned documents, your client needs to forward the LES statements he promised during mediation. I can approve the remainder of the paperwork once that has been received.

"*Upon filing I will provide a signed quitclaim deed for the real estate*.

"RE:  Voluntary dismissal of Appeal
I received a phone call from the Court of Appeals regarding the fax they received from Branden [Valdez' co-counsel]. They are not filing the Voluntary Dismissal as it is improperly filed. Both parties are represented by counsel, therefore any dismissal must be signed by their attorneys of record.

"*I am willing to sign a stipulated joint dismissal if you file a document in District Court that the attorney fees judgment will not be pursued. Absent there being an agreement not to pursue the attorney fees judgment I intend to proceed with that appeal*.

45

"*If you intend to enforce the award of attorney fees I am still amenable to dismissing all but the attorneys fees judgment upon the filing of the journal entry and accompanying documents referenced above*; however, it cannot be done through a voluntary dismissal. If the appellate case is dismissed as to the issues contained in the Decree of Divorce and Journal Entry of Final Settlement then everything is dismissed. There is no such thing as a partial dismissal on the issues.

"If the proposal for district court is acceptable to you I will prepare the proposed paperwork for your consideration. *Once I know whether or not you intend to pursue collection of attorneys fees I can prepare paperwork to be filed in the Court of Appeals*.

"If you prefer to draft the paperwork please let me know so there is not duplication of efforts.

"If any of this requires further discussion please feel free to give me a call.

"Joan." (Emphasis added.)

The above email indicates that Hawkins made delivery of the quitclaim deed to R.G. contingent upon Valdez and R.G. completing certain tasks which Hawkins believed were essential to implementing the agreement the parties had reached in mediation. This may be an example of a lawyer playing hardball on behalf of a client, but it is certainly not unethical behavior. What would constitute unethical behavior is if Hawkins made delivery of the quitclaim deed to R.G. contingent upon Valdez agreeing not to pursue enforcement of the attorney fee sanction levied specifically against Hawkins. Such an action could certainly be construed as failing to expedite litigation. See KRPC 3.2. But nowhere in Hawkins' October 17 email or in her subsequent emails to Valdez does she make such a suggestion.

46

What Valdez wanted is for Hawkins to agree to dismiss the entire appeal pending before the Court of Appeals. But if Hawkins did that, she would have abandoned her right to challenge the attorney fees levied against her. Clearly, that is why Hawkins suggested to Valdez that if she agreed not to enforce the attorney fee sanction, Hawkins would agree to dismiss the appeal. Such an agreement would have rendered as moot the only issue that Hawkins could have properly appealed at that point in time, *i.e.*, the attorney fee sanction. But because Valdez did not agree to Hawkins' suggestion, Hawkins proceeded with her appeal. Though the parties eventually reached a settlement, causing the issues related to the underlying divorce to be dismissed from the appeal on February 21, 2014, the Court of Appeals retained jurisdiction over whether the attorney fee sanction was appropriate. Notably, the Court of Appeals ultimately reversed the district court's order for Hawkins to pay attorney fees. See *In re Marriage of Gerleman*, No. 110,461, 2015 WL 1513967 (Kan. App. 2015) (unpublished opinion).

Though the record indicates that Hawkins did not mail the quitclaim deed to Valdez until April 3, 2014, the hearing panel did not find that this delay constituted a violation of KRPC 3.2. Instead, the hearing panel found a rule violation based on Hawkins allegedly withholding the quitclaim deed in an attempt to have the sanctions against her removed. But as shown above, the record does not support this finding. The panel's conclusion that Hawkins violated KRPC 3.2 by withholding the quitclaim deed is not supported by clear and convincing evidence.

C.      *KRPC 3.3(a)(1)*

KRPC 3.3(a)(1) (2015 Kan. Ct. R. Annot. 601) states: "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." The

47

hearing panel concluded that Hawkins violated this rule in three separate cases: (1) In DA11619, the panel found that Hawkins made false statements when she denied telling Olberding, the deputy clerk, that neither she nor her client would be attending a May 9, 2012, hearing; (2) in DA11730, the panel found that Hawkins submitted a temporary parenting plan and temporary order to the district court which she falsely represented as being approved by opposing counsel; and (3) in DA11918, the panel found that Hawkins made a false statement about her client, G.P., being unable to attend a January 3, 2013, hearing.

1.     *Statement to Olberding Regarding Attendance at Hearing*

Hawkins argues that because her testimony and Olberding's testimony sharply conflicted regarding what was said during their phone conversation on the morning of May 9, the panel was prevented from finding that Hawkins told Olberding that neither she nor he client would be attending the hearing scheduled for later that day. In support of this argument, Hawkins cites *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993), where this court stated that

> "although the report of the disciplinary board 'is advisory only, it will be
> given the same dignity as a special verdict by a jury, or the findings of a
> trial court, and will be adopted where amply sustained by the evidence,
> or where it is not against the clear weight of the evidence, or *where the
> evidence consisted of sharply conflicting testimony*.' [Citation omitted.]"
> (Emphasis added.)

The problem with Hawkins' reliance on this statement is that it is no longer the standard applied by this court to review factual findings made by a hearing panel in attorney disciplinary cases. As this court stated in *In re Barker*, 299 Kan. 158, 165, 321 P.3d 767 (2014):

"This court does not reweigh the evidence or assess the credibility of witnesses. [Citation omitted.] 'Rather, this court examines any disputed findings of fact and determines whether clear and convincing evidence supports the panel's findings. [Citation omitted.] If so, the findings will stand.' [Citation omitted.]"

See also *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 (2008) (clear and convincing evidence is evidence that causes the factfinder to believe that the truth of the facts asserted is highly probable); *In re Lober*, 276 Kan. 633, 637, 78 P.3d 442 (2003) ("When the panel's findings relate to matters about which there was conflicting testimony, this court recognizes that the panel, as the trier of fact, had the opportunity to observe the witnesses and evaluate their demeanor. Therefore, we do not reweigh the evidence or pass on credibility of witnesses.").

The panel found that Olberding's testimony regarding the May 9 phone conversation—specifically, her claim that Hawkins told her that neither she nor her client would be appearing at the hearing later that day—was more credible than Hawkins' testimony denying the statement. Based on the evidence showing that Olberding, after getting off the phone with Hawkins, memorialized her conversation with Hawkins and immediately told the clerk about the conversation, it is highly probable that her recollection of the conversation was accurate. Thus, clear and convincing evidence supports the panel's finding that Hawkins lied to the district court when she denied telling Olberding that she and her client would not be attending the May 9 hearing.

2.      *Hawkins' Representation that Opposing Counsel Approved Temporary Order*

Hawkins argues that she provided evidence to the panel that she had conferred throughout the day with Valdez, opposing counsel in the underlying matter, before submitting the temporary parenting plan and temporary order to the court. Hawkins states that when she submitted the plan and order to the court for approval, she "believed the parties had agreed to certain issues, while reserving other issues that the parties were not in agreement on." Notably, Hawkins does not go into detail about what matters the parties had agreed to and whether those matters were consistent with what she filed with the court. Regardless, at Valdez' deposition, she testified that she approved the parenting plan but did not approve the temporary order prior to Hawkins submitting it to the court. The panel had before it clear and convincing evidence that Hawkins falsely represented in her filing to the district court that the temporary order had been approved by Valdez.

3.      *Hawkins' Statement Regarding G.P.'s Ability to Attend a Hearing*

Hawkins argues that evidence before the panel did not establish that she told Bethany Roberts, opposing counsel, that a January 3, 2013, hearing needed to be continued because Hawkins' client, G.P., did not have transportation to the hearing.

The record shows that G.P. informed Hawkins that she would have difficulty securing transportation to Topeka to attend scheduled hearings. As a result, G.P. asked Hawkins to give her at least 10 days' notice of any scheduled hearing so she could make necessary arrangements to attend a hearing. G.P.'s testimony indicates that she had notice well in advance of a hearing scheduled for January 3. She also testified that she never told Hawkins that she could not attend the January 3 hearing. In fact, G.P. was in the courtroom when the district court continued the January 3 hearing until February 5, 2013.

50

On December 29, 2012, Hawkins emailed opposing counsel the following message:

> "My client informs me that she has difficulty with transportation. Wondering if you would be agreeable to reschedule *if she cannot be there on the 3rd.*
> "I am meeting with her Monday about your proposed agreed order. Honestly don't think she is going to agree but will see." (Emphasis added.)

Roberts testified before the panel regarding the continuance of the January 3 hearing, stating:

> "The January docket Ms. Hawkins and I had been negotiating agreed orders, dismissals, what the orders would look like, that sort of thing, and then *the January docket we had done an agreed order to continue because we thought we had an agreement worked out. So, yes, we had signed an agreed order and I appeared and presented that to the Court.*
>
> "Q.  [By Deputy Disciplinary Administrator] Was there also any suggestion that the client [G.P.] could not appear at the January 3rd?
>
> "A.  Yeah. And I recall—I don't remember if that was December or—it was the January day, yes. The November one where she [Hawkins] was newly appointed, January her client did appear in the November date as well. The January one Joan had said, hey, my client's having transportation problems, *this was via e-mail*, you know, can we continue it. Um, and it was fine. I was familiar with her client by that point to know that her having transportation problems didn't surprise me. Um, and so, yeah, we—that was—she had told me that and I appeared at the hearing with the agreed order to continue.

51

"Q.   And did [G.P.] also appear at the [January 3] hearing?

"A.   She was. She was there. Um, I approached and said, Your Honor, I'm here on this case, we have an agreed order to continue, the respondent doesn't have transportation, and presented the agreed order to the judge." (Emphasis added.)

Roberts stated that after she informed the court that the matter had to be continued due to G.P.'s supposed inability to attend the hearing that day, she realized that G.P. was sitting in the courtroom.

Contained within the record is the "Agreed Order for Continuance" that Hawkins prepared and sent to Roberts. Both attorneys signed the order, and it was submitted to the court on January 3. The order states that "the parties stipulate there is good cause to continue the evidentiary hearing in this matter *in hopes of resolving this matter without court intervention*." (Emphasis added.)

Based on the evidence contained in the record, it appears that Hawkins never informed Roberts that the January 3 hearing *had to be* continued due to G.P.'s inability to attend the hearing. Hawkins' email to Roberts—the only communication with Hawkins that Roberts testified about—simply asked whether Roberts would be willing to continue the January 3 hearing *if* G.P. could not attend the hearing due to transportation issues. Based on Roberts' testimony and the proposed order that Hawkins prepared, it appears that the ultimate basis for the hearing's continuance was the parties' belief that they were close to settling the issue between them and that they needed more time to do so. Thus, if Roberts told the court on January 3 that the hearing had to be continued due to G.P.'s inability to attend, then such a statement appears to be a misstatement of what Hawkins actually communicated to Roberts via email and, consequently, should not be attributed to Hawkins.

52

We conclude that clear and convincing evidence does not support the hearing panel's finding that Hawkins lied to Roberts about the basis for the continuance which, in turn, caused Roberts to convey this lie to the district court. The panel's conclusion that Hawkins violated KRPC 3.3(a)(1) in this regard is not supported by clear and convincing evidence.

D.    *KRPC 3.4(d)*

Next, Hawkins argues that the panel erred in concluding that she violated KRPC 3.4(d) (2015 Kan. Ct. R. Annot. 609) in DA11730 by:  (1) instructing J.G. during her deposition not to answer Valdez' questions about what J.G. would like to have in order to settle her divorce case; and (2) failing to comply with the district court's order for her to turn over adoption records to R.G.'s attorneys.

KRPC 3.4(d) states:  "A lawyer shall not . . . in pretrial procedure, make a frivolous discovery request or fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party."

Hawkins concedes that she instructed J.G. not to answer Valdez' questions. But she contends that her action was proper because J.G. had already provided the requested information in her Domestic Relations Pretrial Questionnaire, which Valdez had received prior to taking J.G.'s deposition.

Hawkins' reason for directing her client not to answer Valdez' questions is not valid considering that K.S.A. 2015 Supp. 60-230(c)(2) states:

> "An objection at the time of the examination, whether to
> evidence, to a party's conduct, to the officer's qualifications, to the
> manner of taking the deposition or to any other aspect of the deposition,

53

must be noted on the record, *but the examination still proceeds; the testimony is taken subject to any objection*. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. *A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court or to present a motion* [for expenses] *under subsection (d)(3)*." (Emphasis added.)

Hawkins' instruction to J.G. not to answer Valdez' questions regarding settlement of the divorce case does not fall under any of the valid reasons outlined above for directing a deponent not to answer a question. At the most, Hawkins should have lodged an objection but still directed her client to answer Valdez' questions. We find that the hearing panel properly concluded that Hawkins violated KRPC 3.4(d) by improperly directing J.G. not to answer Valdez' questions regarding settlement of the case.

With regard to Hawkins' supposed failure to comply with the district court's order to turn over adoption records to R.G.'s attorneys, the Court of Appeals concluded in *In re Marriage of Gerleman*, 2015 WL 1513967, at *5, that there was no evidence before it to suggest that Hawkins failed to comply with a specific court order regarding production of adoption records. Consequently, the Court of Appeals reversed the district court's order that Hawkins pay attorney fees to R.G.'s attorneys. 2015 WL 1513967, at *7-8. It should be noted that the hearing panel's report and the Court of Appeals' opinion were issued on the same day, March 27, 2015.

The Disciplinary Administrator concedes that this opinion is controlling and that the hearing panel's conclusion that Hawkins violated KRPC 3.4(d) by disobeying a court order to produce the adoption records should be rejected. We agree.

54

E.  *KRPC 8.1(b)*

Next, Hawkins argues that the panel's conclusion that she violated KRPC 8.1(b) (2015 Kan. Ct. R. Annot. 661) by failing to provide her case file and trust account records to Leslie Miller (the attorney assigned to investigate M.S.'s complaint of Hawkins in DA11637) was not supported by clear and convincing evidence. KRPC 8.1(b) (2015 Kan. Ct. R. Annot. 661) states in pertinent part:  "[A] lawyer in connection with . . . a disciplinary matter, shall not . . . knowingly fail to respond to a lawful demand for information from . . . [a] disciplinary authority . . . ."

Miller testified that she asked Hawkins to bring M.S.'s case file with her to their scheduled interview on October 11, 2012, but that Hawkins failed to do so. According to Hawkins, she gave the original case file to M.S. and did not retain a copy. Miller said that Hawkins explained this to her, but during the interview, acknowledged that she had kept some correspondence she had with M.S. through email and that these emails were on her computer system. Miller said that Hawkins eventually provided some of the emails to her. Notably, in Hawkins' Answer to the Formal Complaint, filed on August 8, 2014, she admitted that the "investigator asked for proof of the communications" between Hawkins and M.S. and that she "was unable to provide documentation of calls or emails." Hawkins noted in her answer that she was "continuing the search for documentation."

Miller also asked Hawkins to bring "bank records" to the interview and then subsequently clarified to Hawkins that she wanted trust account records due to an allegation in M.S.'s complaint regarding fees. Hawkins brought a document which she created entitled "Funds Transaction Listing." Miller said that she eventually received the trust account records from Hawkins after the original deadline for producing them had passed.

55

When asked whether she thought Hawkins was honest with her during her investigation, Miller stated:

> "I don't know. I felt frustrated by the process because I felt that there were perhaps more documents that were available that weren't provided to me. And I felt as to the trust account records she challenged that quite a bit and I didn't feel like it was an unreasonable request since this was definitely a concern by the client or the complainant about fees. And then the documents that I requested are not what I received. So whether that's dishonesty, I felt, um, that I didn't necessarily get all the information that I wanted or requested that was relevant to my investigation and not in a timely manner."

Hawkins seems to suggest in her brief that though she may not have provided the requested information in a timely fashion, she ultimately complied with the request. Thus, the panel could not have found that she violated KRPC 8.1(b). Hawkins' argument is without merit. We have concluded that the failure to provide a timely response to an initial disciplinary complaint can constitute a violation of KRPC 8.1(b). See *In re Barker*, 302 Kan. 156, 159-60, 162-63, 351 P.3d 1256 (2015). We likewise conclude that Hawkins' failure to timely provide Miller with information she had requested constitutes a violation KRPC 8.1(b).

F.    *KRPC 8.4(c)*

KRPC 8.4(c) (2015 Kan. Ct. R. Annot. 672) states that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The panel concluded that Hawkins violated this rule in two instances: (1) in DA11619, by denying in pleadings and before the district court that she told Olberding that neither she nor her client would be appearing at a May 9, 2012, hearing;

and (2) in DA11730, when she represented that the temporary orders she had filed with the court had been approved by opposing counsel.

Hawkins argues that there is insufficient evidence to support the above factual findings and, thus, the panel's conclusion that she violated KRPC 8.4(c) should be rejected. But, as already noted above, clear and convincing evidence supports each finding. Hawkins also argues that panel could not rely on these findings to conclude that she violated KRPC 8.4(c) because the panel relied on the findings to conclude that she had violated KRPC 3.3(a)(1) (a lawyer shall not knowingly make a false statement of fact or law to a tribunal). Hawkins' argument is without merit because we have concluded in prior attorney disciplinary cases that the same conduct can support violations of both KRPC 3.3(a)(1) and KRPC 8.4(c). See, *e.g.*, *In re Shriver*, 294 Kan. 617, 619, 622, 278 P.3d 964 (2012). We find that the panel properly concluded that Hawkins' conduct violated KRPC 8.4(c).

G.     *KRPC 8.4(d)*

KRPC 8.4(d) states that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." The hearing panel concluded that Hawkins violated this rule in DA11619 by:  (1) attempting to impugn Olberding's reputation by stating that Olberding miscommunicated what she, Hawkins, had said on the telephone; and (2) telling B.S. that his presence at the May 9, 2012, hearing was not necessary, thereby preventing the court from resolving the issues remaining in B.S. and A.S.'s case. The panel also concluded that Hawkins violated KRPC 8.4(d) in DA11730 by:  (1) refusing to turn over the quitclaim deed to opposing counsel which would have allowed R.G. to sell the property; (2) directing J.G. not to answer deposition questions regarding settlement of the divorce case; and (3) failing to comply with the court's order regarding discovery of the adoption records.

1.    *Hawkins' actions in DA11619*

Hawkins takes exception to the panel's finding that she engaged in conduct that was prejudicial to administration of justice by questioning in district court the accuracy of Olberding's memory of their May 9, 2012, phone conversation. As noted above, Hawkins' and Olberding's testimonies regarding their phone conversation conflicted with each other. Olberding claimed that Hawkins told her that neither she nor her client would be appearing at the hearing scheduled for later that day; Hawkins claimed she merely told Olberding that she was filing a motion for a continuance and asked Olberding for possible dates to schedule the hearing. The district court and, subsequently, the hearing panel found Olberding more credible. There is evidence in the record to support this credibility determination. We conclude that the Hawkins engaged in conduct that was prejudicial to administration of justice when she told the district court that Olberding had miscommunicated what was said during their phone conversation. See *In re Tarantino*, 286 Kan. 254, 258, 182 P.3d 1241 (2008) (concluding that attorney's misrepresentation that he would seek to set aside his Missouri default disbarment was a violation of KRPC 8.4[d]); *In re Hansen*, 179 Ariz. 229, 231-33, 877 P.2d 802 (1994) (censuring lawyer under Rules 3.3[a][1], 8.4[a], 8.4[c], and 8.4[d] for lying to court about reason for witness' absence).

Hawkins also contends that the hearing panel erred in concluding that she violated KRPC 8.4(d) by telling her client it was not necessary to attend the May 9 hearing. The panel concluded that this action was prejudicial to the administration of justice because it prevented the district court from resolving the outstanding issues remaining in B.S. and A.S.'s case. Hawkins makes the curious argument that because the parties could not agree to the amount of child support that B.S. should pay to A.S., the panel could not have surmised that the district court would have resolved the issue had B.S. attended the May

58

9 hearing. Hawkins fails to appreciate the fact that the whole purpose of the hearing was to resolve the child support issue which the court, despite the absences of B.S. and Hawkins, determined in A.S.'s favor.

Though the record indicates that the district court resolved the child support issue at the hearing (negating the hearing panel's finding that Hawkins' and B.S.'s absences prevented resolution of the matter) we conclude that Hawkins' actions in connection with the May 9 hearing were still prejudicial to the administration of justice. Her actions caused the district court to rule on the child support issue without the benefit of hearing testimony from B.S. or arguments from Hawkins. Accordingly, we conclude that Hawkins' actions in this regard violated KRPC 8.4(d).

2.      *Hawkins' actions in DA11730*

We have already concluded that the record does not show that Hawkins violated (1) KRPC 3.2—by allegedly withholding a quitclaim deed in an effort to have opposing counsel forgo enforcement of an attorney fee award; or (2) KRPC 3.4(d)—by allegedly failing to comply with a court order regarding discovery of adoption records. Because the record does not establish that Hawkins committed either act, we do not agree with the panel's conclusion that Hawkins, based on these alleged actions, violated KRPC 8.4(d).

In contrast, our above analysis shows that Hawkins violated KRPC 3.4(d) by improperly directly J.G. not to answer questions posed to her at a deposition. We agree with the hearing panel that this conduct also violates KRPC 8.4(d) because it was prejudicial to the administration of justice.

In summary, we find that clear and convincing evidence supports the hearing panel's conclusions that Hawkins violated

- KRPC 1.16(d) by (1) failing to forward the psychological evaluation and police report to M.S.'s subsequent attorney and (2) failing to timely refund unearned fees to M.S.

- KRPC 3.2 by (1) failing to timely respond to requests from Butler to schedule a hearing to resolve the child support issue between B.S. and A.S.; (2) informing Olberding that neither she nor B.S. would be attending the May 9, 2012, hearing; and (3) filing an initial temporary parenting plan that did not reflect the interests or the position of J.G.

- KRPC 3.3(a)(1) by (1) falsely claiming that she did not tell Olberding that neither she nor B.S. would be attending the May 9 hearing; and (2) filing a temporary order which she falsely claimed was approved by Valdez, her opposing counsel.

- KRPC 3.4(d) by improperly directing J.G. not to answers questions posed to her at a deposition.

- KRPC 8.1(b) by failing to timely provide Miller, the attorney assigned to investigate DA11637, with the case file and trust account records related to Hawkins' representation of M.S.

- KRPC 8.4(c) by (1) falsely claiming in pleadings and in open court that she did not tell the deputy clerk that neither she nor her client would be appearing at the May 9 hearing; and (2) by filing a temporary order which she falsely claimed was approved by Valdez.

- KRPC 8.4(d) by (1) causing the district court to rule on the child support issue between B.S. and A.S. without hearing testimony from B.S. or arguments from Hawkins; and (2) improperly directing J.G. not to answer questions posed to her at a deposition.

## APPROPRIATE DISCIPLINE

Before the hearing panel, Hawkins argued that no discipline was warranted because she did not violate any rule. The Disciplinary Administrator recommended that Hawkins be indefinitely suspended from the practice of law or disbarred. A majority of the hearing panel recommended that Hawkins be suspended for 18 months; one member thought a suspension of 1 year was more appropriate.

This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). The court bases its disciplinary decision on the facts and circumstances of the violations and the aggravating and mitigating circumstances present. *In re Johanning*, 292 Kan. 477, 490, 254 P.3d 545 (2011). And although not mandated by our rules, this court and disciplinary panels "[h]istorically" turn to the ABA Standards for Imposing Lawyer Sanctions to guide the discipline discussion. See ABA Compendium of Professional Responsibility Rules and Standards (2012); see also *In re Woodring*, 289 Kan. 173, 180, 186, 210 P.3d 120 (2009) (discussing and applying ABA Standards); *In re Rumsey*, 276 Kan. 65, 78-79, 71 P.3d 1150 (2003) (citing and discussing ABA Standards).

Under the ABA Standards, four factors are considered in assessing punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the misconduct; and (4) the existence of aggravating and

mitigating circumstances. See *Rumsey*, 276 Kan. at 78 (listing the four components of the ABA Standards' framework); ABA Standard § 3.0.

A.      *Ethical Duty*

The hearing panel concluded that Hawkins violated her duty to M.S., a client, by failing to properly terminate representation. The panel also concluded that Hawkins violated "her duty to the public to maintain her personal integrity" and "her duty to the legal system to expedite litigation consistent with the interests of her client."

As indicated above, Hawkins violated her duty to a client by failing to (1) forward documents to M.S.'s subsequent attorney and (2) timely refund unearned legal fees to M.S. Hawkins violated her duty to the public to maintain her personal integrity by (1) denying that she called Olberding and told her that neither she nor B.S. would be attending the May 9 hearing; and (2) filing a temporary order which she falsely claimed was approved by opposing counsel. Hawkins violated her duty to the legal system to expedite litigation consistent with the interests of her clients by (1) failing to timely respond to requests from Butler to schedule a hearing to resolve the child support issue between B.S. and A.S.; (2) causing the district court to rule on the child support issue without hearing testimony from B.S. or arguments from Hawkins; (3) filing an initial temporary parenting plan that did not reflect the interests or the position of J.G.; and (4) improperly directing J.G. not to answer questions posed to her at a deposition.

B.      *Mental State*

The panel found the Hawkins "knowingly violated her duties." The ABA Standards identify three mental states: "intent," the highest culpable mental state; "knowledge," the intermediate culpable mental state; and "negligence," the least culpable mental state. Under the ABA Standards, a lawyer acts intentionally when acting with the

62

"conscious objective or purpose to accomplish a particular result," while a lawyer acts with knowledge when acting "with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result." Finally, a lawyer acts negligently when failing "to be aware . . . that a result will follow . . . ." See ABA Standards, 462; *In re Kline*, 298 Kan. at 216.

Because Hawkins denied any wrongdoing, there is no direct evidence regarding her mental state when she committed the numerous rule violations noted above. But, it can be inferred from the actions constituting the rule violations that Hawkins, at the very least, acted with a conscious awareness of the nature or attendant circumstances of her conduct.

C.      *Injury Resulting from the Misconduct*

The panel concluded that Hawkins' conduct resulted in actual injury to her clients, the legal profession, and the legal system. In support of this conclusion, the panel cited Butler's testimony regarding the additional legal fees her client incurred as a result of Hawkins' attempt to set aside the court's decision resulting from the May 9, 2012, hearing. The panel, relying on Butler's testimony regarding Hawkins' conduct at a June 21, 2012, hearing to set aside the district court's decision, also found that Hawkins "used an impertinent tone with the court and attacked both Ms. Butler and Ms. Olberding." Finally, the panel concluded that Hawkins' actions during her representation of J.G. "resulted in injury to the legal system and to the parties. Specifically, the respondent's actions frustrated the forward action of the case, increased confusion between the parties, and frustrated the court." As noted above, clear and convincing evidence shows that Hawkins (1) filed an initial temporary parenting plan that did not reflect the interests or the position of J.G; and (2) improperly directed J.G. not to answer questions posed to her

at a deposition. We agree with the hearing panel's conclusion that Hawkins caused injury to her clients, the legal profession, and the legal system.

### D.      *Aggravated and Mitigating Circumstances*

This court's rules require that a disciplinary panel explain "[m]itigating or aggravating circumstances which affect the nature or degree of discipline." Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). The panel must consider the evidence presented as to aggravating and mitigating circumstances and determine the weight to be assigned to each in arriving at an appropriate discipline. *In re Walsh*, 286 Kan. 235, 248, 182 P.3d 1218 (2008). On appeal, this court determines whether it agrees with the panel's findings regarding aggravating and mitigating circumstances. See *In re Kline*, 298 Kan. 96, 221, 311 P.3d 321 (2013).

The hearing panel found that the following aggravating circumstances were present:  (1) Prior Disciplinary Offenses; (2) A Pattern of Misconduct; (3) Multiple Offenses; (4) Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rule or Orders of the Disciplinary Process; (5) Refusal to Acknowledge Wrongful Nature of Conduct; and (6) Indifference to Making Restitution. The panel also noted that the "record was void of any 'good character evidence,'" and that

> "seven attorneys in [Hawkins'] legal community testified and all seven testified to problems or negative experiences in working with the respondent. Specifically, both Ms. Butler and Ms. Durkin testified that because of past difficulties, they employ different methods of correspondence with the respondent than they do with other attorneys. Specifically, Ms. Butler and Ms. Durkin both testified that all correspondence with [Hawkins] is done in writing to preserve a record of communication."

64

Because Hawkins claimed that her actions did not violate a single rule, she did not present any mitigating evidence to the panel. Consequently, the hearing panel found that no mitigating circumstances existed.

Now on appeal, Hawkins challenges four of the aggravating circumstances found by the panel. First, with regard to the Pattern of Misconduct conclusion, the panel found that in its "estimation, it appears that the respondent repeatedly engaged in subterfuge in order to either increase her billable fees to her client or to cause unnecessary and unreasonable delay in handling pending matters." Hawkins argues that this statement "has little to no evidence supporting it, as it is not the focus of the Panel's Report or findings of fact." Though Hawkins is correct that the panel did not find that she overbilled clients, the record certainly shows that her actions caused unnecessary delay in resolving pending matters and establishes, as the panel found, a "pattern of obstructing justice."

Hawkins also contends that there was insufficient evidence to support the panel's finding that she committed multiple offenses or that she failed to comply with requests during the investigation into her conduct. But as we have already determined, clear and convincing evidence shows that Hawkins committed numerous rule violations in three separate cases. Moreover, Hawkins failed to timely comply with Leslie Miller's requests for her to produce the client file and trust account records in connection with her representation of M.S.

Finally, Hawkins argues the panel's finding that she was indifferent to making restitution should be reversed because the basis of that finding—the attorney fee sanction levied against her—was reversed by the Court of Appeals in *In re Marriage of Gerleman*, No. 110,461, 2015 WL 1513967 (Kan. App. 2015) (unpublished opinion). The Disciplinary Administrator concedes that any of the panel's findings contrary to the Court

of Appeals' decision should be abandoned. As a result, we do not consider Hawkins' supposed indifference to making restitution as a factor in determining the appropriate level of discipline.

At oral arguments in this case, Hawkins gave an unsympathetic acknowledgment of wrongdoing, stating that she was sorry for any conduct that the court found to be in violation of the KRPC. When asked what she thought would be an appropriate level of punishment should this court find that her actions violated the KRPC, Hawkins suggested a term of probation similar to that imposed in *In re Rumsey*, 301 Kan. 438, 343 P.3d 93 (2015). In *Rumsey*, we decided *sua sponte* to place the respondent on a 3-year term of probation, believing that form of punishment would ensure the respondent's long-term compliance with the KRPC. 301 Kan. at 448. The conduct at issue in *Rumsey* was the respondent's act of calling opposing counsel, during the middle of a criminal trial, a derogatory term and submitting an affidavit to the Disciplinary Administrator which falsely claimed that it was signed before a notary public. 301 Kan. at 440-441. The severity of this conduct was lessened by several mitigating factors, including (1) the respondent's contemporaneous apology to opposing counsel; (2) evidence showing that the respondent was suffering from health problems during trial; (3) the hearing panel's finding that the affidavit was not offered to mislead or deceive the Disciplinary Administrator or the hearing panel; (4) the respondent's cooperation during the disciplinary hearing and his full acknowledgment of wrongdoing; and (5) several witnesses, including two district court judges, who testified to respondent's excellence as a criminal defense attorney. 301 Kan. at 443-45.

In contrast, the conduct at issue here, conduct constituting numerous rule violations, arose from three separate disciplinary complaints. Hawkins' actions included delay in returning unearned legal fees to a former client, filing false pleadings in district court, improperly calling into question the veracity of a court employee, and engaging in

66

behavior that unreasonably delayed the resolution of two legal matters. Additionally, seven attorneys testified about problems or negative experiences they had in working with Hawkins.

Though we have not accepted some of the hearing panel's findings, a majority of this court concludes that the hearing panel's recommended discipline of 18 months' suspension is warranted given the nature and volume of Hawkins' conduct, the duties she violated, and the aggravating circumstances present coupled with the lack of any mitigating evidence. A minority of the court, however, would impose a shorter term of suspension.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Joan M. Hawkins be suspended from the practice of law in the state of Kansas for a period of 18 months, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2015 Kan. Ct. R. Annot. 293).

IT IS FURTHER ORDERED that Hawkins shall comply with Supreme Court Rule 218 (2015 Kan. Ct. R. Annot. 401), and in the event respondent seeks reinstatement, she shall comply with Supreme Court Rule 219 (2015 Kan. Ct. R. Annot. 403).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.