IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,250

In the Matter of BRUCE C. HARRINGTON,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed December 23, 2016. Disbarment.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the brief for the petitioner.

*Bruce C. Harrington*, respondent, argued the cause and was on the brief pro se.

*Per Curiam*: This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Bruce C. Harrington, of Topeka, an attorney admitted to the practice of law in Kansas in 1968.

On November 12, 2015, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). Respondent filed a motion requesting additional time to file an answer; his motion was granted, and the answer was due on December 27, 2015. The respondent filed an answer on December 28, 2015. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on January 21, 2016, where the respondent was personally present. The hearing panel determined that respondent violated KRPC 1.3 (2015 Kan. Ct. R. Annot. 461) (diligence); 1.5(a) (2015 Kan. Ct. R. Annot. 503) (fees); 1.8(b) (2015 Kan. Ct. R. Annot. 530) (using information to the disadvantage of the client); 1.15(a) (2015 Kan. Ct. R. Annot. 556) (safekeeping property); 1.15(d)(2)(v) (failure to produce trust account records for examination);

1

3.3(a)(1) (2015 Kan. Ct. R. Annot. 601) (candor toward tribunal); 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); 8.1(b) (2015 Kan. Ct. R. Annot. 661) (failure to disclose a fact necessary to correct a misapprehension known by respondent); and Kansas Supreme Court Rule 207(b) (2015 Kan. Ct. R. Annot. 328) (failure to cooperate in disciplinary investigation).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"DA11998—N.H. Estate

"11.     The respondent represented R.H. and N.H., husband and wife, for many years. He prepared a last will and testament for each of them.

"12.     On December 30, 2012, R.H. died. Thereafter, the respondent prepared a durable power of attorney for N.H., naming the respondent as attorney-in-fact for N.H. On January 3, 2013, N.H. executed the durable power of attorney. At the time N.H. executed the durable power of attorney, N.H. suffered from dementia. On January 4, 2013, N.H. entered hospice care.

"13.     According to the durable power of attorney, the power was not to take effect until certification of incapacity of N.H. by a physician.

"14.     On January 10, 2013, a check which purported to be signed by N.H., drawn on R.H. and N.H.'s checking account at Quest Credit Union, was issued to the

2

respondent for $2,812.50. On the check it was noted that the payment was made to the respondent for attorney fees.

"15.  On January 21, 2013, the respondent requested a letter certifying N.H.'s incapacity. On January 22, 2013, David Wensel, D.O., executed a certification which provided:

'[N.H.], a resident at Homestead of Topeka, Kansas, has been seen by Midland Hospice. [N.H.] lacks the mental capacity to handle her financial affairs and needs her Power of Attorney, Bruce C. Harrington, to handle those matters for her.'

"16.  On February 1, 2013, the respondent issued a check drawn on R.H. and N.H.'s checking account made payable to himself in the amount of $3,062.50. The respondent signed the check '[N.H.] by Bruce C. Harrington POA.' On the check, the respondent noted that the payment was made for past due attorney fees.

"17.  On February 6, 2013, the respondent issued a check drawn on R.H. and N.H.'s checking account made payable to himself in the amount of $1,125.00. The respondent signed the check '[N.H.] by Bruce C. Harrington POA.' On the check, the respondent noted that the payment was for services.

"18.  On February 8, 2013, N.H. died. Pursuant to the terms of the durable power of attorney, the authority of the respondent to act ceased upon the death of N.H. The respondent, however, continued to issue checks to himself drawn on R.H. and N.H.'s checking account after the death of N.H. under the durable power of attorney.

"19.  On February 9, 2013, the day following N.H.'s death, the respondent issued a check drawn on R.H. and N.H.'s checking account made payable to himself in the amount of $500.00. The respondent signed the check '[N.H.] by Bruce C. Harrington POA.' On the check, the respondent noted that the payment was for fees.

3

"20. On February 19, 2013, the respondent filed a petition to admit N.H.'s will to probate under the Kansas Simplified Estates Act. In the petition, the respondent represented that he had been named as attorney and the alternate executor in the will. However, the respondent had not been named alternate executor in the will.

"21. On March 7, 2013, the court issued an order appointing the respondent to serve as the executor of N.H.'s estate. Based upon the respondent's representation that he had been named as the alternate executor in the will, the court allowed the respondent to serve without bond. In his response to the investigation, the respondent stated, 'The fact that the will does not list me as Executor is not really important, in my view.'

"22. On March 7, 2013, the respondent issued a check drawn on R.H. and N.H.'s checking account made payable to himself in the amount of $5,196.00. The respondent signed the check '[N.H.] by Bruce C. Harrington.' The respondent did not make a notation on the check as to what the check was for.

"23. The respondent filed a probate pleading that included the following statement: 'The check written as Power of Attorney for [N.H.], for $5,196.00 is an accumulation of many hours of attorney services provided to [R.H.], the decedent's husband for years prior to [R.H.]'s death.' However, the respondent's time records reflect time spent working on N.H.'s estate case which total $5,196.00. The respondent's time records also indicate that the respondent paid himself for that time on March 7, 2013.

"24. On March 18, 2013, the respondent issued a check drawn on R.H. and N.H.'s checking account made payable to himself in the amount of $2,000.00. The respondent signed the check, '[N.H.] by Bruce C. Harrington.' On the check, the respondent noted that the check was for 'Attorney—Estate.'

"25. The respondent opened a checking account for the estate of N.H. Without seeking and obtaining court permission, in the subsequent months, the respondent issued the following checks to himself, drawn on the checking account which the respondent opened for the estate of N.H.:

4

| 'Date | Check No. | Amount | Notation |
|-------|-----------|--------|----------|
| April 1, 2013 | 4055 | $1,000.00 | Attorney Fees |
| April 27, 2013 | 4058 | $2,250.00 | Fees |
| May 3, 2013 | 4059 | $3,000.00 | (no notation) |
| May 13, 2013 | 4060 | $2,000.00 | Fees—Probate |
| May 18, 2013 | 4061 | $2,000.00 | (no notation) |
| May 28, 2013 | 4062 | $3,000.00 | Att & Exec Fees |
| June 6, 2013 | 4064 | $1,500.00 | Fees |
| June 18, 2013 | 4065 | $1,500.00 | Fees' |

Between January 10, 2013, and June 18, 2013, the respondent received a total of $30,946.00 for fees from N.H. and her estate.

"26.  On July 19, 2013, the respondent filed a petition for final settlement in the N.H. estate. In the petition, the respondent stated:

> 'Bruce C. Harrington is named as Attorney and Executor in the Will and has performed valuable services to the Estate. For the services of Attorney and Executor in an amount of $350.00 per hour, being $250.00 an hour attorney fees and $100.00 an hour executor fees, for a total of 58 hours, the sum of $20,300.00.'

The respondent failed to file a proper accounting in the N.H. estate. Additionally, the respondent failed to publish notice to creditors prior to filing his petition for final settlement. As a result of failing to publish this notice, the closing of the estate was delayed.

"27.  B.J. Hickert, an attorney retained by the beneficiaries of the N.H. estate, requested that the respondent provide a detailed statement of his time spent working on the estate case. The respondent's time records reflect that he charged $350.00 an hour for 55.2 hours. The respondent paid himself as both executor and attorney for every hour he billed in connection with N.H.'s estate.

5

"28.     On August 21, 2013, Mr. Hickert filed a response to the petition for final settlement on behalf of the beneficiaries under the will. In that pleading, the beneficiaries alleged that the respondent's fee was unreasonable. The only assets in the estate included three bank accounts at Capitol Federal, two bank accounts and a certificate of deposit at Quest Credit Union, two insurance refunds, and a tax refund.

"29.     On September 30, 2013, the respondent filed a reply to the beneficiaries' response, claiming a fee of $14,500.00, by calculating his fee at $250.00 per hour for 58 hours.

"30.     Mr. Hickert and the respondent reached a settlement and the respondent refunded N.H.'s estate $10,000.00. On October 2, 2013, the respondent filed a motion to withdraw as attorney and executor of N.H.'s estate.

"31.     On November 8, 2013, M.O., one of the heirs and beneficiaries, was appointed as administrator c.t.a. of N.H.'s estate. In April 2014, the administrator c.t.a. and Mr. Hickert closed N.H.'s estate.

"DA12163—Savings Bonds

"32.     In early 2008, S.A. found some savings bonds, worth more than $50,000.00, in her grandmother's name, E.B. E.B. had previously died on April 25, 1991. E.B. was survived by her only child, V.B., S.A.'s father. V.B. died shortly after E.B., on May 9, 1991. V.B. was survived by his wife, H.B. (S.A.'s step-mother) and two children, S.A. and S.A.'s brother, D.B. H.B. was still living at the time the savings bonds were located. However, H.B.'s location was unknown.

"33.     S.A. retained the respondent to file a probate case to determine the ownership of the savings bonds and distribute the property to the proper persons.

"34.     On January 4, 2008, the respondent filed a petition for determination of descent in V.B.'s estate. On February 4, 2008, the court held a hearing on the petition filed by the respondent. The court ordered that the savings bonds be distributed under the

laws of intestate succession. S.A. and D.B. were to each receive one-fourth of the proceeds of the redemption of the savings bonds. H.B. was to receive one-half of the proceeds.

"35. The court authorized the respondent to redeem the savings bonds and to distribute the proceeds pursuant to the court's order. In the event the respondent was unable to locate H.B., the court ordered the respondent to place the proceeds belonging to H.B. with the clerk of the district court or retain the proceeds in his attorney trust account. The court approved attorney fees in the amount of $2,475.00 to be paid by the heirs.

"36. Following the redemption of the savings bonds, on April 21, 2008, the respondent deposited the proceeds, in the amount of $53,484.00, into his trust account. According to the court's order, the proceeds of the savings bonds should have been distributed as follows:

| 'Respondent (court approved fees) | $2,475.00 |
| H.B. | $25,504.50 |
| S.A. | $12,752.25 |
| D.B. | $12,752.25' |

"37. On April 25, 2008, the respondent made the following distributions from the proceeds of the redemption of the savings bonds:

| 'Respondent | $3,000.00 |
| S.A. | $12,621.00 |
| D.B. | $12,621.00' |

The amount of fees paid by the respondent to himself exceeded the amount approved by the court.

"38. The respondent was unable to locate H.B. and thus, was unable to distribute her share of the proceeds. Over time, the respondent converted the funds

7

belonging to H.B. and used the proceeds for personal expenses. By February 10, 2012, the respondent had depleted the full amount of the funds held for H.B. and the balance in the respondent's trust account was $26.97.

"39.     On February 22, 2012, S.A. sent the respondent a letter and directed the respondent to pay H.B.'s share of the proceeds of the redemption of the savings bonds into the Kansas State Treasurer, Department of Unclaimed Property.

"40.     Following the receipt of S.A.'s letter, the respondent drew $25,000.00 from an open line of credit he had with the Kaw Valley Bank, Topeka, Kansas. On February 27, 2012, the respondent deposited the proceeds from the loan into his trust account. On February 28, 2012, the respondent issued a trust account check to the Kansas State Treasurer, Department of Unclaimed Property, in the amount of $25,000.00. On February 29, 2012, the respondent forwarded the $25,000.00 to the Kansas State Treasurer, Department of Unclaimed Property.

"41.     On September 22, 2014, the disciplinary administrator docketed a complaint against the respondent for his handling of H.B.'s funds. On September 29, 2014, the respondent forwarded a response to the initial complaint. In the respondent's letter, he stated:

'Finally, [S.A.] asked me to pay the funds which had been held in my trust account that belonged to [H.B.] in the sum of $25,000.00 into the unclaimed property department [*sic*] of the Kansas State Treasurer, which occurred.'

"42.     On October 9, 2014, Mr. Hazlett wrote to the respondent, expressed his concern regarding the location of the $25,000.00 from the time the respondent received it until the respondent forwarded it to the Kansas State Treasurer, Department of Unclaimed Property, and requested that the respondent provide the trust account records which would show what happened to the monies.

8

"43.     On November 20, 2014, Mr. Hazlett wrote to the respondent again, requesting that he provide the trust account records. Mr. Hazlett directed the respondent to provide the trust account records by December 1, 2014. The respondent failed to provide the records by December 1, 2014.

"44.     On December 4, 2014, the respondent wrote to Mr. Hazlett. In the letter, the respondent stated:

'I am not ignoring your several correspondences with me the last thirty (30) days. As you may or may not know, I am still recovering from a near death surgery I had for an abdominal aortic aneurism [*sic*] on September 8th, I am still not back up to full speed.

'Also, as I am sure you are aware my office mate of thirty five years, Gary Miller passed away and that has caused significant trauma and upheaval in the office.

'Be that as it may, I have contacted the bank and they advise me that the trust account statements are destroyed by them after five (5) years, so from oral conversations with bookkeeping at the bank, it would appear that trust account documents are not available from 2007 to 2009 or 10, anyway I have ordered the same and I will produce them shortly.

'Again, I am not ignoring your communications, and I intend to respond and cooperate fully to the best of my ability. I would appreciate it if we could set a date for shortly after the first of the year, 2015, for me to provide you with these documents and we can then proceed accordingly.

'If that is not acceptable, please advise me and I will do the best I can under difficult circumstances.'

"45.    On January 28, 2015, Mr. Hazlett issued a business records subpoena for the respondent's trust account records, for the dates of January 1, 2008, through June 1, 2012. Despite the respondent's statement to the contrary, the bank had the trust account records. On February 5, 2012, the bank provided a copy of the respondent's trust account records to the disciplinary administrator.

"46.    On February 25, 2015, Terry Morgan, special investigator with the disciplinary administrator's office, sent the respondent a letter, informed the respondent that his trust account records had been obtained by subpoena, and directed the respondent to answer seven specific questions. One of the questions asked by Mr. Morgan was for the name of the Kaw Valley Bank employee who told him that the trust account records were not available.

"47.    On March 13, 2015, the respondent wrote to Mr. Morgan. In the letter, the respondent stated that he did not recall the name of the Kaw Valley Bank employee who told him that after 5 years trust account and checking account statements are destroyed and therefore not available. The respondent requested Mr. Morgan provide him with a copy of the trust account records received by subpoena from the bank.

"48.    On March 18, 2015, Mr. Morgan provided a copy of the trust account records to the respondent.

"49.    On March 20, 2015, Mr. Morgan sent the respondent another letter and requested additional information. Mr. Morgan asked the respondent to fully explain certain checks which had been issued following receipt of the proceeds of the redemption of the savings bonds.

"50.    On April 6, 2015, the respondent wrote to Mr. Morgan, but the respondent did not provide the requested information nor did he answer the questions previously posed by Mr. Morgan. The respondent requested additional time to comply with the requests.

10

"51.    On May 11, 2015, Mr. Morgan wrote to the respondent. Mr. Morgan noted that the respondent had not yet responded to the earlier requests for information. Mr. Morgan provided the respondent with an additional 10 days to respond to the inquiries.

"52.    In a letter dated May 5, 2015, the respondent wrote to Mr. Morgan and provided some information. The information the respondent provided, however, did not address many of the areas delineated in Mr. Morgan's February 25, 2015, and March 20, 2015, letters. The respondent failed to provide the requested information and failed to answer most of the questions posed.

"*Conclusions of Law*

"53.    In DA11998, based upon the findings of fact above, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.5(a), KRPC 1.8(b), KRPC 3.3(a)(1), KRPC 8.1(b), KRPC 8.4(c), KRPC 8.4(d), and Kan. Sup. Ct. R. 207(b). [Footnote:  The disciplinary administrator alleged that the respondent's failure to timely file a proper accounting and the respondent's failure to properly publish notice to creditors in N.H.'s estate case amounted to a violation of KRPC 1.1 and KRPC 1.3. While the respondent did fail to timely file a proper accounting and the respondent failed to properly publish notice to creditors in N.H.'s estate case, the hearing panel concludes that those two matters do not rise to the level of violations of KRPC 1.1 and KRPC 1.3 in DA11998.] In DA12163, based upon the respondent's stipulation and the findings of fact above, the hearing panel concludes that the respondent violated KRPC 1.3, KRPC 1.5(a), KRPC 1.15(d), KRPC 8.1(b), KRPC 8.4(c), and Kan. Sup. Ct. R. 207(b).

"KRPC 1.3

"54.    Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. In DA12163, the respondent stipulated that he failed to represent V.B.'s estate diligently. As such, the hearing panel concludes that the respondent violated KRPC 1.3.

11

"55.    KRPC 1.5 provides that '[a] lawyer's fee shall be reasonable.' The respondent violated KRPC 1.5 in both cases. First, in DA11998, the respondent paid himself over $30,000.00 between January 2013, and June 2013, for handling a simple estate consisting of five bank accounts, a certificate of deposit, two insurance refunds and a tax refund. While the respondent refunded $10,000.00 of the fees to the estate, his remaining fees were still unreasonable. In DA12163, the respondent stipulated that he charged an unreasonable fee. In that case, the court approved a fee of $2,475.00. The respondent, however, paid himself $3,000.00. The hearing panel concludes that the respondent violated KRPC 1.5 by charging unreasonable fees in both cases.

"KRPC 1.8(b)

"56.    KRPC 1.8(b) provides:

'A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.'

In DA11998, the respondent used his knowledge of N.H.'s mental and financial condition to the disadvantage of her estate. Because the respondent used information relating to the representation of N.H.'s estate to the estate's disadvantage, the hearing panel concludes that the respondent violated KRPC 1.8(b).

"KRPC 1.15(a) and (d)

"57.    Lawyers must properly safeguard the property of others. KRPC 1.15(a) specifically provides that:

'(a)    A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a

12

separate account maintained in the state of Kansas. Other property shall
be identified as such and appropriately safeguarded. Complete records of
such account funds and other property shall be kept by the lawyer and
shall be preserved for a period of five years after termination of the
representation.'

In this case, the respondent failed to properly safeguard H.B.'s property. The respondent, over time, converted $25,000.00 to his own use. Thus, the hearing panel concludes that the [respondent] violated KRPC 1.15(a). Additionally, attorneys must maintain attorney trust account records and produce the records upon request by the Disciplinary Administrator. KRPC 1.15(d)(2)(v) provides that '[t]he lawyer shall: . . . [p]roduce all trust account records for examination by the Disciplinary Administrator upon request of the Disciplinary Administrator. . . .' The respondent failed to produce his attorney trust account records as requested by the disciplinary administrator. Therefore, the hearing panel concludes that the respondent also violated KRPC 1.15(d)(2)(v).

"KRPC 3.3(a)(1)

"58.     KRPC 3.3(a)(1) provides that '[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal.' The respondent made false statements of material fact when he asserted in probate pleadings that he was named as the alternate executor in N.H.'s will. Additionally, the respondent made false statements of material fact to the Court when he alleged in a pleading filed in the probate court that: 'The check written as Power of Attorney for [N.H.], for $5,196.00 is an accumulation of many hours of attorney services provided to [R.H.], the decedent's husband for years prior to [R.H.]'s death.' According to the respondent's time records, the $5,196.00 was for time spent working on N.H.'s estate. The respondent repeated the false statement during the investigation of the disciplinary case and, again, during his testimony before the hearing panel. Because the respondent provided false information to the Court and to this panel, the hearing panel concludes that the respondent violated KRPC 3.3(a)(1).

13

"KRPC 8.4(c)

"59.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent violated KRPC 8.4(c) in both cases. In DA11998, the respondent engaged in conduct involving dishonesty when he made false statements in the probate pleadings that he had been named as alternate executor and when he made statements regarding the $5,196.00. The respondent repeated the false statements regarding the $5,196.00 during the disciplinary investigation and during his testimony before the hearing panel. The respondent also engaged in conduct that involved dishonesty when he wrote numerous checks to himself totaling more than $30,000.00 from the estate of N.H. In DA12193, the respondent engaged in conduct that involved dishonesty when he used the funds belonging to H.B. for his personal use. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"KRPC 8.4(d)

"60.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he continued to write checks under the durable power of attorney after N.H. had died. Additionally, the respondent engaged in conduct that was prejudicial to the administration of justice when he failed to obtain court approval prior to when he paid himself fees in N.H.'s estate case. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b)

"61.    Lawyers must cooperate in disciplinary investigations. KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b) provide the requirements in this regard. '[A] lawyer in connection with a . . . disciplinary matter, shall not: . . . knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority . . . .' KRPC 8.1(b).

14

'It shall be the duty of each member of the bar of this state to aid
the Supreme Court, the Disciplinary Board, and the Disciplinary
Administrator in investigations concerning complaints of misconduct,
and to communicate to the Disciplinary Administrator any information
he or she may have affecting such matters.'

Kan. Sup. Ct. R. 207(b). In DA11998, the respondent violated KRPC 8.1(b) and Kan.
Sup. Ct. R. 207(b), by providing false information in his response regarding the
$5,196.00 paid for fees associated with N.H.'s estate. In DA12163, the respondent
stipulated that he violated KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b) by failing to answer
the questions and provide the information requested by Mr. Morgan. Because the
respondent knowingly failed to cooperate in the disciplinary investigations, the hearing
panel concludes that the respondent violated KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b).

"*American Bar Association
Standards for Imposing Lawyer Sanctions*

"62.     In making this recommendation for discipline, the hearing panel
considered the factors outlined by the American Bar Association in its Standards for
Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors
to be considered are the duty violated, the lawyer's mental state, the potential or actual
injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating
factors.

"63.     *Duty Violated*. The respondent violated his duty to his clients to provide
competent and diligent representation. The respondent violated his duty to his client to
properly safeguard his client's property. The respondent violated his duty to the legal
system to be honest with the courts. The respondent violated his duty to the legal
profession to cooperate in disciplinary investigations. The respondent violated his duty to
the public to maintain his personal integrity.

"64.     *Mental State*. The respondent knowingly and intentionally violated his
duties.

15

"65.     *Injury*. As a result of the respondent's misconduct, the respondent caused actual serious injury to his client, to the legal system, and to the legal profession.

"Aggravating and Mitigating Factors

"66.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"67.     *Prior Disciplinary Offenses*. The respondent has been previously disciplined on one occasion. In 2003, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.15.

"68.     *Dishonest or Selfish Motive*. The respondent's misconduct was motivated by dishonesty and selfishness as evidence by his false statements to the court in N.H.'s estate case and his conversion of funds belonging to H.B. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty.

"69.     *A Pattern of Misconduct*. The respondent engaged in a pattern of misconduct in both cases.

"70.     *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.3, KRPC 1.5(a), KRPC 1.8(b), KRPC 1.15(d), KRPC 3.3(a)(1), KRPC 8.1(b), KRPC 8.4(c), KRPC 8.4(d), and Kan. Sup. Ct. R. 207(b). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"71.     *Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process*. The respondent failed to provide answers to the questions posed by Mr. Morgan. The respondent's repeated failure to provide written responses to the questions amounts to bad faith

16

obstruction of the disciplinary proceeding by intentionally failing to comply with rules and orders of the disciplinary process.

"72.    *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process*. In his letter dated May 5, 2015, the respondent indicated that he did not know the name of the bank employee who told him that the trust account records were destroyed. However, at the hearing on the formal complaint, the respondent testified that the bank employee's name was Yvonne. The presiding officer of the hearing panel pointed out that he previously could not recall the name of the bank employee but yet during the hearing, the respondent indicated the bank employee's name is Yvonne. In response, the respondent backtracked and stated that he believed the bank employee's name to be Yvonne but he was not certain. The respondent's testimony was false. Additionally, at the hearing on this matter, the respondent continued to state that the $5,196.00 was for attorney fees earned during R.H.'s lifetime, despite his handwritten time records and calculations indicating otherwise. The hearing panel is troubled by the respondent's false testimony.

"73.    *Vulnerability of Victim*. N.H. and her estate were particularly vulnerable to the respondent's misconduct.

"74.    *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1968. At the time of the misconduct, the respondent has been practicing law for more than 40 years.

"75.    *Indifference to Making Restitution*. The respondent refunded N.H.'s estate $10,000.00 and the respondent has paid the $25,000.00 into the Kansas State Treasurer, Department of Unclaimed Property. However, the respondent failed to refund the fees which he paid himself in excess of what the court allowed in V.B.'s determination of descent case.

"76.    *Illegal Conduct, Including that Involving the Use of Controlled Substances*. When the respondent converted H.B.'s funds, the respondent engaged in illegal conduct.

17

"77.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"78.     *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. The respondent provided information that he underwent surgery for an abdominal aortic aneurysm in September 2014. It is difficult to determine what, if any, impact the respondent's surgery had on the underlying misconduct.

"79.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent stipulated to the rule violations in DA12163. The respondent's cooperation regarding this case is a mitigating factor.

"80.     *Imposition of Other Penalties or Sanctions*. The respondent refunded $10,000.00 in fees to N.H.'s estate.

"81.     *Remoteness of Prior Offenses.* The discipline imposed in 2003 is remote in character and in time to the misconduct in this case.

"82.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.11     Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

'4.41    Disbarment is generally appropriate when:

. . . .

(b)       a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

(c)       a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

'5.11    Disbarment is generally appropriate when:

. . . .

(b)       a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious[ly] adversely reflects on the lawyer's fitness to practice.

'6.11    Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

'7.1    Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.'

"*Recommendation*

"83.    The disciplinary administrator recommended that the respondent be disbarred. The respondent made no recommendation, other than to request an additional six months to wind down his practice.

"84.    The misconduct in this case is serious: the respondent converted client property to his own use. The hearing panel is concerned that if the respondent is allowed to continue to practice, the respondent will cause additional financial harm to clients and members of the public. Thus, the hearing panel recommends that the disciplinary administrator file a motion to have the respondent's license temporarily suspended pending the proceedings before the Supreme Court. Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be disbarred.

"85.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

Pursuant to the hearing panel's recommendation, the Disciplinary Administrator filed a motion with this court to temporarily suspend respondent from the practice of law in Kansas pending resolution of this proceeding. A majority of this court denied that motion upon the showing at that time.

20

Respondent received adequate notice of the formal complaint, of the hearing before the panel, and of the hearing before this court. Respondent filed exceptions to the hearing panel's final hearing report, purporting to challenge all of the panel's findings of fact, albeit in an extraordinarily cursory manner. Respondent filed a short and conclusory brief with this court, which is consistent with respondent's statement at the panel hearing that his ultimate goal in these proceedings was to postpone his disbarment in order that he might have time to wind down his practice. Nevertheless, we discern from his brief to this court that respondent continues to make essentially four claims, to-wit:  (1) the panel's denial of respondent's motion to continue the date of its hearing denied respondent the right to be represented by his chosen attorney; (2) the Disciplinary Administrator's failure to require respondent's office mate to file his report and complaint in writing denied respondent "fundamental fairness and due process of law"; (3) the panel erroneously determined that respondent misused the durable power of attorney granted to him by N.H.; and (4) the evidence does not support disbarment, especially in light of the fact that respondent paid back the $25,000 he was holding for H.B. by depositing that sum with the Kansas State Treasurer. At the hearing before this court, respondent's only request was simply to be granted an additional 90 days to wind down his practice. The Disciplinary Administrator continued to recommend disbarment.

*Standard of Review*

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth

21

of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

*Denial of Continuance*

As noted, respondent alleges that the denial of his request for a continuance of the January 21, 2016, disciplinary hearing prevented him from being represented by his chosen counsel and therefore was a denial of due process. Continuances of disciplinary hearings are discretionary, and, therefore, the denial of a motion for continuance is reviewed for an abuse of discretion. See *Miller v. Glacier Development Co.*, 284 Kan. 476, 494, 161 P.3d 730 (2007) (granting or denial of a continuance is discretionary in civil cases); *In re Seck*, 258 Kan. 530, 534, 905 P.2d 122 (1995). Judicial discretion is abused if the action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Moyer*, 302 Kan. 892, 902, 360 P.3d 384 (2015).

Moreover, the Internal Operating Rules of the Kansas Board for Discipline of Attorneys, D.2, provide that continuances are disfavored, except on a valid showing of extreme circumstances. (2015 Kan. Ct. R. Annot. 427). The rationale for that rule is that the ultimate goal in disciplinary matters "is to protect the public" and an expeditious resolution of disciplinary complaints helps to prevent the offending attorney from harming other clients or the public. *In re Lockett*, 270 Kan. 640, 645, 17 P.3d 917 (2001). In denying the continuance in this case, the panel cited the serious nature of the allegations against Harrington and the need to protect the public. We agree.

Nevertheless, we cannot ignore respondent's rights because the Due Process Clause of the United States Constitution applies to lawyer disciplinary proceedings. *In re Landrith*, 280 Kan. 619, 640, 124 P.3d 467 (2005). The basic elements of procedural due

process are notice and an opportunity to be heard. The question of what process was due respondent is a question of law subject to unlimited review. 280 Kan. at 640. But, in addition, the respondent has the burden to show that he was actually prejudiced by any failure in his proceedings. See Kansas Supreme Court Rule 224(d) (2015 Kan. Ct. R. Annot. 423) (burden is on respondent to show actual prejudice by clear and convincing evidence).

Respondent argues that the continuance was necessary because his attorney of choice was hospitalized and unable to represent him at the January 21, 2016, hearing. He asserts that he had only 10 days in which to procure substitute counsel, suggesting that circumstance impaired his ability to be heard before the hearing panel.

But respondent's depiction of the timeline is, at best, incomplete. Although the hearing panel's denial of the continuance was filed just 10 days before the disciplinary hearing, that was because respondent did not file the motion for continuance until 13 days before the hearing, on January 8, 2016. The record indicates that respondent was aware of his chosen attorney's hospitalization as early as December 1, 2015, a month and a half before the scheduled hearing. Moreover, respondent had received notice of the hearing date by November 17, 2015, and he was aware that the two complaints had been filed against him in January 2014, and September 2014, respectively. Respondent knew for more than 2 years that a complaint against him was pending and he had more than 2 months' notice of the panel hearing. If respondent was unable to obtain representation for the hearing, it was not because his continuance motion was denied. Pointedly, he not only appeared pro se at the disciplinary hearing, but he also appeared before this court without counsel, some 9 months later, suggesting that time was not the problem in obtaining counsel.

23

In sum, respondent had ample notice of the hearing and sufficient time to procure counsel. His failure to procure representation at the panel hearing was a matter of his own doing. The hearing panel did not abuse its discretion by denying the motion for continuance.

*No Written Complaint*

The Disciplinary Administrator first learned of the possible misconduct in case DA 12,163 through an informal conversation with respondent's office mate. The office mate did not submit a written complaint, and he died before the panel hearing. Respondent contends that the office mate had an impure motive and the absence of a written formal complaint from the office mate was a due process violation.

Respondent mistakenly suggests that all disciplinary proceedings must be commenced by a written complaint from a third party. Our rules contemplate that the Disciplinary Administrator may learn of misconduct through means other than a formal complaint and impose a duty on the Disciplinary Administrator to investigate all possible misconduct, "whether called to his or her attention by complaint or otherwise." Kansas Supreme Court Rule 205(c)(2) (2015 Kan. Ct. R. Annot. 324). Additionally, the failure of a complainant to sign a complaint does not automatically abate a disciplinary complaint. Kansas Supreme Court Rule 213 (2015 Kan. Ct. R. Annot. 384).

Most importantly, however, the absence of a written formal complaint from the office mate did not prejudice respondent in any manner. The Disciplinary Administrator developed the evidence against respondent through his office's own investigation. No statement or other direct evidence from the office mate was offered as proof of the violations at the disciplinary hearing. The Disciplinary Administrator's establishment of

24

respondent's rules violations through independently obtained evidence rendered the initial complainant's motive irrelevant. There was no due process infirmity here.

*Misuse of Power of Attorney in Case DA 11,998*

Respondent's argument on this issue consists of a single conclusory sentence: "There is no evidence the Appellant misused the General Durable Power of Attorney for [N.H.] in Case Number DA11998." To the contrary, the record contains clear and convincing evidence of respondent's misuse of his attorney-in-fact authority.

Pointedly, respondent drafted the power of attorney in this case, negating any claim that he did not know the conditions of his authority to act on behalf of N.H. The power of attorney document unequivocally provided that respondent's authority would commence upon the certification of N.H.'s incapacity by a physician and that it would terminate upon N.H.'s death. Yet the proffered evidence, consisting of canceled checks, bank statements, and respondent's business records, clearly and convincingly establish that respondent continued to draw checks on N.H.'s accounts after her death. Even more egregious, the unauthorized checks were made payable to the respondent. In short, respondent clearly misused the authority bestowed upon him by his client in the power of attorney, as well as betraying the trust inherent in that arrangement.

*Appropriate Discipline*

This court is not bound by the recommendations of disbarment by the Disciplinary Administrator and the hearing panel. *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). We base our disciplinary decision on the facts and circumstances of the violations and the aggravating and mitigating circumstances found to exist. *In re Johanning*, 292 Kan. 477, 490, 254 P.3d 545 (2011). Although not mandated, this court historically looks

to the ABA Standards for Imposing Lawyer Sanctions to guide the discipline discussion. *In re Hawkins*, 304 Kan. 97, 140, 373 P.3d 718 (2016).

The ABA Standards provide four factors to consider: (1) the ethical duty violated; (2) the attorney's mental state; (3) actual or potential injury caused by the attorney's misconduct; and (4) aggravating and mitigating circumstances. *Hawkins*, 304 Kan. at 140 (citing ABA Standard 3.0). The hearing panel considered ABA Standards 4.11 (conversion of client property), 4.41 (lack of diligence), 5.11 (failure to maintain personal integrity), 6.11 (false statements to the court), and 7.1 (violation of professional duty), and found that disbarment was also warranted under those standards. We agree.

At oral argument before this court, respondent's only requested sanction was to be permitted an additional 90 days to wind down his practice. In his brief, respondent makes a passing reference to probation being the appropriate sanction. But he failed to develop and implement a probation plan prior to the disciplinary hearing as required by Kansas Supreme Court Rule 211(g). (2015 Kan. Ct. R. Annot. 350); see *In re Long*, 266 Kan. 664, 667, 972 P.2d 773 (1999) (court declined to order probation when attorney had not presented plan prior to oral argument).

Respondent's brief also contended that his $25,000 payment into the Kansas Unclaimed Property Fund resulted in no financial harm to his client in DA 12,163, and, consequently, disbarment was not warranted. That argument fails on more than one level.

To begin, the argument's factual premise—that respondent made full restitution—is simply false. The district court ordered that respondent distribute to H.B., or for her benefit, the sum of $25,504.50. respondent's remittance to the Kansas State Treasurer was $504.50 short. Additionally, the court approved attorney fees of $2,475, but respondent paid himself $3,000, pocketing another $525 of his clients' money.

26

More importantly, however, even a full restitution at that point would not have negated the fact that respondent converted his client's funds for his personal use—an ethical violation of the highest order. Moreover, this court has consistently repudiated "no harm, no foul" arguments in disciplinary cases. See, *e.g.*, *In re Kline*, 298 Kan. 96, 178-79, 311 P.3d 321 (2013); *In re Black*, 283 Kan. 862, 879, 156 P.3d 641 (2007); *In re Berg*, 264 Kan. 254, 270, 955 P.2d 1240 (1998).

Finally, the panel took into consideration that respondent refunded $10,000 to N.H.'s estate and paid $25,000 into the Kansas State Treasurer's unclaimed property fund. Respondent essentially asks this court to place more weight on those facts than the hearing panel did. We decline to reweigh that evidence.

In sum, we agree with the hearing panel's determinations that respondent violated his duties to his clients, to the legal system, to the profession, and to the public; that he did so knowingly and intentionally; and that these violations caused actual injury to his clients, the legal system, and the profession. Further, this court unanimously holds that disbarment is the appropriate sanction and that, for the protection of respondent's other clients and of the public, the disbarment is made effective upon service of an order of disbarment upon the respondent.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Bruce C. Harrington be and he is hereby disbarred in accordance with Supreme Court Rule 203(a)(1) (2015 Kan. Ct. R. Annot. 293), effective immediately upon the service upon respondent of an Order of Disbarment.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

LUCKERT, J., and ROSEN, J., not participating.

MICHAEL L. QUINT and ROBERT J. BEDNAR, district judges, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Quint and District Judge Bednar were appointed to hear case No. 115,250 vice Justice Luckert and Justice Rosen respectively under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.